## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Joshua D. Pennell,

       Plaintiff,

 -vs-

The Cellular Connection, LLC,

      Defendant.

Case No. 1:24-cv-01104-PAB

JUDGE PAMELA A. BARKER

MEMORANDUM OPINION & ORDER

   Currently pending before the Court is the Motion for Summary Judgment of Defendant The Cellular Connection, LLC ("TCC" or "Defendant"), filed on April 29, 2025 ("TCC's Motion"). (Doc. No. 16.)  On June 12, 2025, Plaintiff Joshua D. Pennell ("Pennell" or "Plaintiff") filed his Brief in Opposition to TCC's Motion ("Pennell's Opposition").  (Doc. No. 23.)  On June 24, 2025, TCC filed its Reply in support of its Motion ("TCC's Reply").  (Doc. No. 24.)

   For the following reasons, TCC's Motion (Doc. No. 16) is GRANTED.

## I. Undisputed Material Facts

### A. Background Information

   In 1998, Pennell began experiencing symptoms of depression and sought the assistance of a therapist for his "depressive mood."  (Doc. No. 17-1, Pennell Depo. at Tr. 61:4-63:1.)  In 2007, he was diagnosed with "clinical depression."  (*Id.* at Tr. 63:8-63:11.)  His symptoms include "intermittent intense fatigue" which is "overwhelming at times" and his "emotional state sometimes doesn't reflect the current situation that [he's] in."  (*Id.* at Tr. 64:3-64:11.)  According to Pennell, his symptoms also include "sleep disturbances, inability to awaken from sleep and disorientation

upon awaking, excessive daytime sleepiness, episodes of uncontrollable sadness and emotional upset, dizziness or light-headedness, and compulsive eating.  These symptoms, when active, affect [his] ability to concentrate, think, work, learn, and sleep." (Doc. No. 23-1, Pennell Decl. at PageID# 1129.)

In 2017, Tom Sikora ("Sikora") hired Penell to be a Regional Manager for TCC, where he worked until TCC terminated his employment on May 2, 2023.  (Pennell Depo. at Tr. 33:9-33:11.)  Sikora was a "Dealer Director" for TCC, and served as Pennell's direct supervisor throughout Pennell's tenure at TCC.  (Pennell Decl. at PageID# 1130; Sikora Depo. at Tr. 12:1-12:3.)  Pennell was responsible for selling equipment to one dealer, Bryan Delaney, who owned thirty-five (35) retail Verizon locations.  (Pennell Depo. at Tr. 34:9-35:21.)  He also "assisted with 20 additional locations outside [his] region owned by Delaney."  (Pennell Decl. at PageID# 1130.)

According to TCC, "Regional Managers were required to attend weekly team meetings and complete at least 16 store visit reports per month."  (Doc. No. 16 at PageID# 95.)  However, Pennell testified that "[t]he 16 minimum store visits was often subject to change" "[d]epending on situations happening within our region."  (Pennell Depo. at Tr. 87:5-88:5.)  Pennell also testified that "[f]requently the 16 suggested minimum number was not obtained by myself and others."  (*Id.*)

### B.  Pennell's October 2019 Disclosure of Depression

Pennell claims that he first disclosed his diagnosis of depression to Sikora on October 23, 2019.  (Pennell Depo. at Tr. 66:8-66:22.)  Pennell and Sikora were attending a fifty-person (50) meeting in Scottsdale Arizona "to hear a presentation by a team from Motorola."  (*Id.* at Tr. 95:10-96:11.)  During an "intermission,"  Pennell "sent [Sikora] a text message and asked to speak with

2

him in the hallway privately."  (*Id.* at Tr. 96:8-96:11.)  Pennell testified that during that discussion

with Sikora, he

> presented to [Sikora] my emotional state, my diagnosis of depression, so that I could
> help him understand why I was experiencing the symptoms that I was at the time . . .
> and then I asked him if I could – if he would excuse me from part of that meeting
> because I was feeling this way, and I didn't – I didn't think it was going to go away.
> I was in tears sort of explaining this to him.  I really had no choice other than to explain
> it.

(Pennell Depo. at Tr.  66:8-66:22.)    According  to  Pennell,  Sikora  acknowledged  Pennell's

presentment of his emotional state and his "diagnosis of depression" and accommodated him by

excusing him from the meeting, testifying that "[Sikora] understood, obviously, as he could see what

I --  what was happening and excused me from the back half of that meeting so I could go be by

myself and kind of let it pass." (*Id.* at Tr. 67:2-67:6.)  At another point during his deposition, Pennell

repeated that testimony:  "Q.  You say you disclosed to your supervisor, Tom Sikora, on October

23rd, 2019, that you suffered from depression, correct?  A.  Clinical depression, yes."  (*Id.* at Tr.

95:1-95:4.)   Sikora disputes that Pennell mentioned his "depression" to him on October 23, 2019.

(Sikora Depo. at Tr. 26:16-27:17.)  Instead, according to Sikora, Pennell did not tell him why Pennell

was taking medication, and that "[t]he only thing that I remember is something about either [Pennell]

stopped taking medication or the medication needed adjusted."  (Sikora Depo. at Tr. 27:20-27:22.)

### C.    Pennell and Sikora's 2021-2022 Text Message Exchanges

Throughout 2021 and 2022, Pennell and Sikora exchanged several text messages where

Sikora accommodated Pennell's request to miss certain work obligations:

> Pennell:  "Hey Tom I'm going to miss our call this morning, was moving furniture
> yesterday and tweaked my back badly . . . I can't move at all so I'm worried about
> this, I'll let you know what's happening as things change.
>
> Sikora:  Sorry to hear about the back buddy!  I cancelled the call since I'm in meetings
> all week.

3

Sikora:  How's the back bud? Hope its getting better.

Pennell:  Miserable, not a smart move what I did.

Sikora: Man, sorry to hear that buddy.  Advils and heating pad!

(Nov. 2021 Text Exchange, Doc. No. 17-3 at PageID# 494.)[1]

Pennell:  I'm heading over to pick up my kids from school, someone has called in bomb threat.  Keep you posted.

Sikora:  Oh wow, hope everything is ok.

Sikora:  Were to you able to get the boys?

Pennell:  Yes, thank you.  Took a while to get them settled.  All good now.

(Jan. 25, 2022 Text Exchange, *Id.* at PageID#s 500-01.)

Pennell: One more sick day today and I'll be out of the weeds here.  I'll add to dayforce, thanks Tom.

Sikora:  Hope you feel better buddy, chicken soup and Gatorade!!  Take it easy.

(Feb. 23, 2022 Text Exchange, *Id.* at PageID# 504.)

Pennell:  Hey Tom I have an appointment this morning at 10 that I can't reschedule, I'll send commitments shortly, My Apologies.

Sikora: Ok, I'll send you some notes for what we need to accomplish with your region this month . . .

(April 2022 Text Exchange, *Id.* at PageID# 507.)

Pennell:  I've caught the rona.

Sikora:   Sorry to hear Josh!  How are you feeling?

Pennell:  like hell, coughing and aches since yesterday morning.  Super great timing lol.

---

[1] Only the month is provided where the exact date of this text message is undecipherable from the exhibit.

>     Sikora:  We'll [sic] rest up and feel better!  I'll let Johnny know you won't be making it to Orlando.

(May 20, 2022 Text Exchange, *Id.* at PageID#s 515-16.)

>     Pennell: I'm not feeling well this morning, need to skip our call.  Got my vaccination yesterday, call you later.
>
>     Sikora: Sounds good, glad to hear you got your vaccination!  Feel better.

(Aug. 3, 2022 Text Exchange, *Id.* at PageID# 491.)

### D.    Pennell's December 2022 Failure to Submit Store Visit Reports

On December 6, 2022, TCC held a "dealer team meeting" in Tampa, Florida.  (Pennell Depo. at Tr. 87:13-87:15; Doc. No. 16 at PageID# 96.)  The agenda for that meeting included a section on "Store Visits" and a sub-bullet that provides in relevant part: "16 Minimum per month (new form?) Visit report needs sent out within 24 business hours of visit.  Send to Owner, DM, Director, and Johnny."  (Doc. No. 18-2 at PageID# 680.)  Sikora testified that "the goal" was "to at least get to 16."  (Sikora Depo. at Tr. 31:15-31:16.)[2]  During his deposition, Pennell testified that from November 17, 2022 through December 19, 2022, he submitted zero (0) Store Visit Reports.  (Pennell Depo. at Tr. 136:2-136:20)  (confirming that it was "accurate" that TCC "ha[d] not received a store visit from from [Pennell] since November 17th, 2022.").   Pennell testified that on December 19, 2022, Sikora initated a conversation during which Pennell mentioned his depression:

>     A. . . . [D]uring this conversation, we did discuss -- well, like he asked me what -- what was going on, and I explained how I was feeling again, what the effects of my depression were, making me very tired, and that's when he made -- made the suggestion that I take the -- some time off at the end of December –
>
>     Q.  So that –

---

[2] In a text to Sikora on December 14, 2022, Pennell wrote that he "caught the crud that's been making its way around" and that there was "no place to go but up for me in 2023."  (Doc. No. 16 at PageID# 105; Doc. No. 17-2 at PageID# 533.)

A.  -- which I did.

Q.  Okay.  He -- he suggested taking time off?

A.  Yes.

Q.  How much time did you take?

A.  One week . . .

(Pennell Depo. at Tr. 137:23-138:14.)  Pennell testified that during that conversation he asked Sikora if he could apply his "accrued time off for for time that [he] had missed[,]" and recalled the following:

Q.  When did you [ask for leave]?

A.  I had used the system to request time off throughout my time at TCC, but I specifically asked for it in December of 2022.

Q.  What did you specifically ask for in December of 2022?

A.  I asked Tom if I could use my accrued time off for time that I had missed.

Q.  And that was in December of 2022?

A.  Yes.

Q.  What did Tom say?

A.  He didn't respond.

Q.  This was a verbal conversation?

A.  Yes.

Q.  In person or on the phone?

A.  On the phone.

Q.  Was anyone else on the call other than you and Tom?

6

A.  Not that I know of.

Q.  Did -- in December 2022 did you ask Tom for a specific period of time off?

A.  I did.

Q.  What did you ask for?

A.  I asked for the use of two days of my personal time, or -- or paid time off, rather.

(Pennell Depo. at Tr. 50:8-51:6.)  After that conversation, on December 20, 2022, "Sikora issued

[Pennell] a Corrective Action for not timely completing and issuing store visit reports."  (Doc. No.

23 at PageID# 1111; December 20, 2022 Corrective Action, Doc. No. 17-2 at PageID# 470.)[3] The

December 20, 2022 Corrective Action includes a "Description of Incident" that reads as follows:

> Per our conversation in April 2022, you needed to complete and send out store visit
> reports, per the expectations in your role.  We have not received a store visit form from
> you since 11/17/2022.  The expectation is that you send these out on a weekly/ monthly
> basis to the appropriate individuals.  If you do not send these out timely, as stated, you
> will be subject to further disciplinary action, up to and including termination.

(Doc. No. 17-2 at PageID# 470.)  The "Action Required by Employee" included the following:

> 16 minimum store visits completed and sent out per month
> The visit report needs to be emailed out within 24 business hours of the visit.
> Send to the Owner, DM, your Director, and Johnny.
> Subject line: Store Visit -POS# - Ownership Group — Date of Visit (Owner Meeting,
> In Person, Virtual)
> Virtual visits (Microsoft Teams) can be used when necessary

(*Id.*)  Both Pennell and Sikora signed the December 20, 2022 Corrective Action.  (*Id.*)  The parties

do not dispute that Pennell successfully completed his Store Visit Reports following the December

20, 2022 Corrective Action.  (Pennell Depo. at Tr. 137:23-138:14.)

---

[3] A review of the December 20, 2022 Corrective Action document demonstrates that the "Current Date" of it was 12/19/2022 but Pennell and Sikora signed it on December 20, 2022.  (Doc. No. 17-2 at PageID# 470.)

That same day, Sikora emailed the December 20, 2022 Corrective Action to Kimberly Miller, TCC's Director of Human Resources.  (Doc. No. 19-2 at PageID# 835.)  On December 21, 2022, Miller emailed Sikora, "[d]id you still want to connect on your convo with Josh?"  (*Id.* at PageID# 834.)  On December 22, 2022, Sikora responded "Yes, are you available this morning for a 15 min call? Say 10:00 am?"  (*Id.*)  They had a phone conversation, and Miller testified that during that conversation, "[h]e let me know that when he issued the the documentation to Josh that Josh disclosed to him that he was going through a divorce.  We talked about our EAP program, our employee assistance program, which would be a free confidential resource that Josh could use if he needed additional support.  That's what our conversation was about."  (Doc. No. 19-1, Miller Depo. at Tr. 60:25-61:7.)  When asked if Sikora told Miller that Pennell "had been battling with depression" or that Pennell "takes medication for his depression[,]" Miller answered "No."  (*Id.* at Tr. 61:16-61:23.)[4]

### E.    March 26-28, 2023 Convention in Atlanta and March 30, 2023 Final Written Warning

TCC hosted a "Wireless Zone Convention"[5] at the Loews Hotel in Atlanta, Georgia from Sunday, March 26, 2023 through Tuesday, March 28, 2023. (Doc. No. 16 at PageID# 98; Doc. No. 23 at PageID# 1112; Pennell Depo. at Tr. 106:17-106:23.)  Pennell testified that "the commitment [was] to be at the conference, Sunday, Monday, and Tuesday."  (*Id.* at Tr. 109:17-109:19.)  The following events occurred from that Sunday through Thursday, March 30, 2023.

---

[4] On January 19, 2023, Miller emailed Sikora to "check in to see how everything is going and if you need any additional support?" to which Sikora responded "Everything is good.  Josh is improving on store visit reports and seems to be in a better place. I will keep you in the loop as we move along. Thanks for reaching out, Kim."  (Doc. No. 19-2 at PageID# 833.)

[5] Hereinafter, the "March 2023 Convention."

8

### 1.      Sunday, March 26, 2023

At 7:13 AM on Sunday, March 26, 2023, the first day of the March 2023 Convention, Pennell texted Sikora that he missed his 6:00 AM flight from Cleveland, Ohio to Atlanta because "that weather knocked down trees and power lines yesterday up here.  My drive is blocked and power is still out, can't believe it.  Nobody hurt but I missed my flight, call you later."  (Doc. No. 18-2 at PageID# 702.)[6]  Later that morning, Sikora texted him asking him if he was flying out of Cleveland, which Pennell confirmed, and at 12:04 PM, Pennell texted that "Power is back and debris has been cleared, I can get out to airport now.  Lots of alternate flights available.  Keep you posted."  (*Id.* at PageID# 703.)  That evening, Pennell texted Sikora that his "head [was] splitting" but that he would fly to Atlanta at 6:00 AM the next day.  (*Id.*)

### 2.      Monday, March 27, 2023

On Monday, March 27, 2023,  Pennell flew to Atlanta to attend the second day of the March 2023 Convention.  (Pennell Depo. at Tr. 113-117.)  Pennell testified that his tasks that day included "be[ing] a guide to lunch" and being "a guide to a bus in the lobby at 6:15 [PM]."  (*Id.* at Tr. 120:11-120:21.)  He was supposed to "guide people to the buses that would be taking [convention attendees] to The Painted Duck[,]" a local restaurant.  (Pennell Depo at Tr. 139:12-140:12.)  Pennell testified that he "didn't do any of those things."  (*Id.* at Tr. 120:19-120:21.)  He claims he "forgot" to be a guide during lunch and "forgot" about the 6:15 PM after-hours event at The Painted Duck.  (*Id.* at Tr. 120:11-121:12) ("I forgot about these.").  Pennell testified that he "began to experience extreme mental and physicial exhaustion," so when the day's events ended at 2:15 PM he "[w]ent right back

---

[6] Pennell included a photograph as evidence of the weather, which he claimed was "[f]rom the airport near me[,]" depicting a large neon yellow truck and a smaller white truck in front of a large building, and a third object that is too blurry to make out from the exhibit.  (*Id.*)

to [his] hotel room." (*Id.* at Tr. 118:2-118:4, 121:14-121:20.)[7]  At 10:08 PM, Sikora texted Pennell, "[d]id you make it to the painted duck? We are playing duck pin bowling?"  (Doc. No. 18-2 at PageID# 706.)

### 3.  Tuesday, March 28, 2023

Tuesday was the final day of the March 2023 Convention.  At 7:05 AM on Tuesday, March 28, 2023, Pennell responded to Sikora's text message from the evening before, "No, I was exhausted by then and needed to lay down."  (*Id.*)  At 10:42 AM, during one of the convention events, Sikora texted Pennell "Most of us are sitting near the back right corner.  Where are you?"  (*Id.*)  When Sikora had not heard back from Pennell, he called the front desk of the hotel to have the hotel staff perform a "wellness check."  (Sikora Depo. at 68:23-70:14.)  The hotel staff woke Pennell around 11:00 AM and Pennell texted Sikora back at 11:23 AM, "Getting dressed."  (Doc. No. 18-2 at PageID# 706.)  However, Pennell was too late, and he testified that he did not attend any event that day.  (Pennell Depo. at Tr. 119:16-119:17) ("Q.  Did you attent any of the sessions on Tuesday.  A. I did not.").  Later that day, Pennell left the Loews Hotel to return to Cleveland.  (Pennell Depo. at 119:10-119:12; Doc. No. 23 at PageID# 1113 [Pennell admitting that because "he had missed the day's events, [he] went to the airport to return home."].)

### 4.  Wednesday, March 29, 2023

On Wednesday, March 29, 2023 Sikora and Pennell had a phone conversation about Pennell's absences at the March 2023 Convention.  (Pennell Depo. at Tr. 124:3-129:25.)  Pennell testified that it was his "impression" that Sikora "accused [him] of missing the [Painted Duck event] because he merely didn't feel like going."  (*Id.* at Tr. 124:13-124:18.)  Pennell concedes that he

---

[7] He did not leave his room until Tuesday, March 28, 2023 to go to the airport.  (*Id.* at 119:10-119:13.)

"slept right through it obviously." (*Id.* at 125:9.)  But he asserts that Sikora "didn't seem to – either didn't understand or didn't care what I explained after that, so the – reason I fell asleep and missed it didn't seem important to him."  (*Id.* at Tr. 125:10-125:13.)  Pennell testified concerning his recollection of the conversation as follows:

Q.  So have you told me everything about the March 29th phone call with Tom Sikora, about what you said and what he said?

A.  I may have neglected to mention that I attached how I felt and -- and -- and my, you know, with the extreme fatigue, was related to my -- my disability or depression. I'm not sure if I had mentioned that the first time.

Q.  Well, what did -- did you say the fatigue was related -- what specifically did you say the fatigue was related to?  Your disability or your depression, which one was it?

A.  Well, depression I said at the time, yeah.

Q.  In the -- in the March 29th call?

A.  Yes.

Q.  And –

A.  And it was in an assumptive manner, since we had -- I mean, we had talked about it before, and I assumed he remembered.  So I remember stating something to the effect of, we've talked -- you know, that we've talked about this before, that it's the same issue, and that it wasn't caused by anything else but that.

Q.  How did the call end?

A.  The call in March after the conference?

Q.  Correct.

A.  He said he was going to send over my disciplinary document to review and sign.

Q.  And he did that?

A.  Yeah.

11

(Pennell Depo. at Tr. 128:20-129:24.)  Later in his deposition, Pennell elaborated on his recollection

of the conversation:

> Q.  So what were the -- the other things that were discussed were what?
>
> A.  Well, I tried to explain to him why I was so tired and what caused it, and that it was unavoidable for me.
>
> Q.  And under, 'Action Required By Employee,' it says, 'It is expected to be on time and attend all sessions and events for any meetings, conventions and all business functions. If there are' – 'if there is a reason that will not let you attend any of the above, timely communication with adequate reasons is needed.' Did I read that correctly?
>
> A.  Yes.
>
> Q.  Okay. And you understood all that?
>
> A.  I did.
>
> Q.  Okay.
>
> A.  Although -- I mean, I did notify him as  soon as I -- I knew, and that, you know, again, I  reiterated to him that this -- these symptoms and why I overslept and was so tired was caused by my disability.

(*Id.* at Tr. 140:15-141:11.)  Pennell claims, although Sikora denies, that Sikora said in an "accusatory

tone," "Are you depressed or are you tired?"  (*Id.* at Tr. 125:22-125:24.)  Pennell testified that during

the conversation, and as he had done in December 2022, he asked Sikora for time off "but it had

already occurred."  (*Id.* at Tr. 127:3-127:6.)  When asked to clarify this in his deposition, Pennell

confirmed:

> Q.  You weren't asking for any time off going forward?
>
> A.  No.
>
> Q.  What you were asking for was retroactively, if you could apply a couple of PTO days to the time you missed at the conference?

12

A. That's right.

(*Id.* at Tr. 127:10-127:16; Pennel Decl. at PageID# 1130.) After the conversation, Sikora issued

Pennell a Final Written Warning (the "March 30, 2023 Final Written Warning").[8] (Doc. No. 17-2

at PageID# 471.) Like the December 20, 2023 Corrective Action, it included a "Description of the

Incident":

> It was communicated to Josh via email on 3/15/23 that one of his responsibilities
> during the Wireless Zone Convention was to be in the hotel lobby at 6:15 on Monday,
> 3/27 to guide people to the busses that would be taking us to the night event at the
> Painted Duck. Josh was a no-show for this responsibility. This also led to Josh not
> attending the Convention's Monday night event at the Painted Duck. I text Josh at
> 10:08 PM Monday, 3/27 asking if he made it to the Pained Duck. He responded on
> 3/28 Tuesday, at 7:05 am, "No, I was exhausted by then and needed to lay down."
> Later Tuesday morning, Josh was absent from the convention and breakout session. I
> text Josh at 10:42 AM to let him know we were in the back right corner of the room
> and asked him where he was. Josh responded at 11:23 am, "Getting Dressed." With
> the convention ending at 11:30, Josh was absent for Tuesday's breakouts and main
> sessions.

(*Id.*) It included the following "Action Required by Employee[,]" "It is expected to be on time and

attend all session and events for any meetings, conventions, and all business functions. If there is a

reason that will not let you attend any of the above, timely communication with adequate reasons is

needed." (*Id.*) Finally, although Pennell did not include an "Employee Comment" in response to

---

[8] Before Sikora issued the March 30, 2023 Final Written Warning, Sikora contacted Sarah Jane Raney, TCC's Senior HR Generalist. (Doc. No. 22-3 at PageID# 1072-73.) Raney emailed Miller summarizing Sikora's conversation with Pennell, and her own conversation with Sikora. (*Id.*) In her email, Raney confirmed that Sikora was "teetering on just terming him, but he has been a long-time, decent employee. Tom believes he has a lot of things going on in his personal life. He referenced possible medical issues and divorce/custody battle." (*Id.*) In Miller's email response to Raney, Miller mentioned that "Josh is going through some personal things outside of work, that Tom and I have discussed are potentially impacting him at work . . . Sounds like Tom's nicely giving him the benefit of the doubt on this one[.]" (*Id.*) That evening, Miller also wrote to Sikora, in relevant part, "Also, if there is something going on FMLA related, that you find out let us know as well, I know you have given him EAP previously as well." (Doc. No. 19-2 at PageID# 844.) In his deposition, Sikora answered "No" when asked "did you ever provide information to Mr. Pennell about the Family Medical Leave Act?" (Sikora Depo. at Tr. 20:21-20:24.)

13

the December 20, 2023 Corrective Action he received, Pennell did provide an "Employee Comment"

to the March 30, 2023 Final Written Warning that reads as follows:

> Going forward I will take care in attending all business functions or communicate ahead of time if I'm not able.  I did not plan ahead with the intention of avoiding convention events or tasks, and responded to messages immediately once I read them. Travel complications over the previous 36 hours seemed to take a heavier toll on me than normal.  According to our convention schedule, there was 1+ hour remaining including Recap and Closing Remarks, from 11:45 to 12:15, which I hoped to join but ended early.

(*Id.*)  On March 30, 2023, Pennell signed the March 30, 2023 Final Written Warning.  (Doc. No. 17-

2 at PageID# 471.)

**F.     May 1, 2023 Team Meeting  and May 2, 2023 Termination**

Pennell acknowledges that less than (five) 5 weeks later, on May 1, 2023, he "fell asleep and

missed a regularly scheduled 10:00 AM call with Sikora and his team."[9]  (Doc. No. 23 at PageID#

1115.)  Sikora texted Pennell at 9:59 AM, "[a]re you getting on our team call" but received no

response.  (Doc. No. 17-3 at PageID# 473.)

According to Sikora and Miller, after Pennell missed that meeting, he and Miller talked over

the phone and decided to fire Pennell in the "early afternoon":

Q.  . . .What was discussed during that call?

A.  That Josh had missed a mandatory meeting and was already on a final.  And then proceeded to send a text message later, like did not respond to Tom's initial text messages.  He waited hours to respond to that text message, and when he responded, he said he slept through his alarms.

Q.  Okay.  Anything else you discussed during that conversation?

A.  We did discuss next steps.

Q.  Okay.  And what next steps did you discuss?

---

[9] Hereinafter, the "May 1, 2023 Team Meeting."

14

A.  Termination because he was already on a final written warning for attendance.

(Miller Depo. at Tr. 82:5-82:20; Sikora Depo. at Tr. 84:25-85:3 ["Q. When during that time period did you have this call with Ms. Miller?  A.  It was early afternoon.  I don't know the exact time."].)  Shortly before 1:47 PM, Pennell called Sikora, who declined the call and texted back, "Finishing a call.  Call you after."  (Pennell Depo. at Tr. 145:1-145:25.)  Pennell then sent five (5) identical texts to Sikora from 2:03 to 2:17 PM,[10]  "I stayed late working on my last few visits from April and slept through my alarms!"  (*Id.*)  Still not having heard from Sikora, at 4:18 PM, Pennell sent an email to Sikora, writing:

> Tom, Wanted to let you know about the appointment I made to address some of the mental health challenges I've experienced, specifically over the past year or so. June 13th is the earliest I could get in, and was scheduled back in February.  I'm looking forward to discussing my symptoms with the doc and ultimately feeling better.  This is where I'm going - https://www.acmchealth.org/provider-directory/providers/samar-el-savegh-md/ Thanks[.]

(Doc. No. 17-2 at PageID# 469.)[11]  At 5:54 PM, Sikora sent the following email to Miller:

> Let me know when you have time to chat about Josh Pennell.  Today he missed my team call from 9:30 am to 10:45 am.  I texted him at 9:59 am to see if he was getting on the call, with no reply.  He tried calling me at 1:47 pm while I was on a call, so I texted him I was on a call and would have to call him later.  He texted me at 2:03 pm, "I stayed up late working on my last few visits from April and slept through my alarms."  Please note that there were no visits sent out from Josh last night.  He sent out four visits from last week today between 2:20 and 2:36.  Most of the content of the visit reports had the same content with a few different points related to that specific location's visit.  My point is that these visits would not have taken long to do the night before, and why wouldn't these have been sent out Sunday night if that is what he was working on?

> Later today, Josh emailed the attached email about making a doctor's appointment to address his mental health challenges.

---

[10] Pennell claims the duplicated texts were unintentional, testifying that when he "checked his messages, [he] had only sent it once."  (Pennell Depo. at Tr. 145:14-145:15.)

[11] Hereinafter, Pennell's "4:18 PM Email."

(Doc. No. 18-2 at PageID# 675.)  According to Sikora, this email was a "recap email" because he and Miller had already determined to fire Pennell during their phone conversation earlier in the afternoon.  (Sikora Depo. at Tr. 86:2-86:10.)

On May 2, 2023, Sikora and Miller fired Pennell over a video call.  (Sikora Depo. at Tr. 88:4-88:7; Miller Depo. at Tr. 93:16; Pennel Depo. at Tr. 134:11-134:15.)[12]

## II.    Procedural History

Pennell filed his Complaint on June 28, 2024.  (Doc. No. 1.)  Therein, he asserts five (5) claims against TCC: Disability/Perceived Disability Discrimination under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.* (Count I); Disability/Perceived Disability Discrimination under Ohio Rev. Code § 4112.02(A) (Count II); Failure to Provide Reasonable Accomodation under the ADA, 42 U.S.C. § 12112 (Count III); Failure to Provide Reasonable Accomodation under Ohio Rev. Code § 4112.02(A) (Count IV); and Family and Medical Leave Act Interference under the Family and Medical Leave Act (the "FMLA"), 29 U.S.C. § 2611 *et seq.* (Count V).

On April 29, 2025, TCC filed its Motion.  (Doc. No. 16.)  On June 12, 2025, Pennell filed his Opposition.  (Doc. No. 23.)  On June 24, 2025, TCC filed its Reply.  (Doc. No. 24.)

## III.   Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict

---

[12] In its Answer to Pennell's Interrogatory No. 12, TCC identified Jon Wertenberger as Pennell's replacement, and noted that he "has not disclosed any disabilities" to TCC.  (Doc. No. 18-2 at PageID# 686.)

16

in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx. 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx. 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 Fed. Appx. at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox,* 53 F.3d at 150).

IV.     **Analysis**

A.      **Disability Discrimination Claims (Counts I and II)**

Pennell asserts disability discrimination claims under 42 U.S.C. § 12101 *et seq.* (Count I) and Ohio Rev. Code § 4112.02(A) (Count II).[13]

The *McDonnell Douglas* three-step framework applies to Pennell's discrimination claims. *See Moore v. Next Generation Hosp. LLC*, 2025 WL 3025607 at *4 (6th Cir. Oct. 29, 2025) (quoting *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021)).

At the first step of the *McDonnell Douglas* framework, the plaintiff must establish his *prima facie* case. *Id.*  To establish the *prima facie* case for an ADA discrimination claim, the plaintiff "'must show that (1) [he] is actually disabled or regarded as having a disability; (2) [he] is otherwise qualified for the position, with or without a reasonable accommodation; (3) [he] suffered adverse action; (4) [his] employer knew or had reason to know of [his] disability; and (5) [his] position remained open or [he] was replaced.'"  *Edwards v. Shelby Cnty.*, -- F.4th --, 2025 WL 3119922 at *5 (6th Cir. Nov. 7, 2025) (quoting *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023)); *Pemberton v. Bell's Brewery, Inc.*, 150 F.4th 751, 767 (6th Cir. 2025) (citing *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004)).  At the second step, "[o]nce the employee establishes a *prima facie* case of discrimination, 'the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action.'"  *Moore*, 2025 WL 3025607 at *4 (quoting *Thompson*, 985 F.3d at 522 ).  Lastly, at step three, "'[i]f the employer meets its burden, the burden shifts back to the plaintiff to establish that the proffered reason was merely pretext for unlawful

---

[13] *Brune & Ashing v. Basf Corp.*, 234 F.3d 1267 (6th Cir. 2000) (citation omitted) ("The analysis for disability discrimination claims is essentially the same under the ADA and Ohio Rev.Code § 4112.02(A).").  Accordingly, the Court analyzes both Counts I and II using the same framework.

discrimination.'"  *Id.* (quoting *Thompson*, 985 F.3d at 522).  In this case, the parties dispute only the fourth element of Pennell's *prima facie* case, i.e., whether TCC knew or had reason to know of Pennell's disability.

> **1.  Pennell established a *prima facie* case for his discrimination claims.**

> **a)  Summary of the Parties' Arguments**

TCC claims that Pennell's "theory of disability discrimination" is that TCC had notice of his disability because Pennell exhibited impairment in his ability to 'concentrate, think, learn, sleep, and work.'"  (Doc. No. 16 at PageID# 104) (quoting Doc. No. 1 at PageID# 7).  But TCC did not have notice, it contends, because Pennell "never disclosed any specifics about his medical diagnosis, never submitted a treatment plan, never provided physician-imposed work restrictions, or otherwise submitted any medical documentation to TCC."  (*Id.*)  TCC challenges four of Pennell's assertions on which Pennell relies to establish sufficient notice: (a) in October 2019, Pennell informed Sikora of his depression diagnosis;[14] (b) in December 2022, Pennell informed Sikora of "episodes of extreme fatigue;" (c) in February 2023, Pennell informed Sikora that he had a medical appointment; and (d) in March 2023, Pennell told Sikora that his depression caused his fatigue.  (*Id.* at PageID#s 104-05) (citing Doc. No. 1 at PageID# 3-4.)

> **(1)  Pennell's October 2019 Disclosure of Depression**

TCC argues that *Hrdlicka* established that a plaintiff's mere reference to depression, without more, is not sufficient to provide notice because it does not "always rise to the level of a disability"

---

[14] As noted above, Sikora denies this allegation. The Complaint's full allegation is "10. On or about October 23, 2019, Mr. Pennell, while weeping, disclosed to his supervisor, Tom Sikora, Director of Sales and Operations, that he suffered from depression and that he had suffered from depression for over 10 years.  Mr. Pennell explained, through tears, to Mr. Sikora that he would experience episodes of extreme fatigue and emotional upset and that he took medication on a regular basis to treat his medical conditions."  (Doc. No. 1 at PageID# 3.)

and that Sikora (allegedly) responded to Pennell by directing him to contact HR, but Pennell never did so.  (*Id.* at PageID# 105.)

In Pennell's Opposition, he responds that whether TCC was aware of Pennell's disability is an issue of fact for the jury.  (Doc No. 23 at PageID# 1117.)  Pennell asserts that in October 2019, he "specifically told Sikora that he was diagnosed with and suffered from depression and described to Sikora the severe symptoms caused by his depression" and that "he was on medication and under the care of a doctor."  (*Id.* at PageID# 1118.)

In TCC's Reply, TCC reiterates that Pennell's mere reference to depression did not provide notice under applicable Sixth Circuit law.  (Doc. No. 24 at PageID#s 1135-38.)

### (2)     Pennell's December 2022, February 2023, and March 2023 Commmunications

Regarding these communications, in its Motion, TCC refutes that Pennell's other alleged disclosures in December 2022, February 2023, and March 2023 constitute notice.  (Doc. No. 16 at PageID#s 105-06.)  TCC argues that notice was not provided by Pennell's December, 14 2022, text to Sikora,[15] Pennell's February 2023 telephone call to Sikora about his upcoming "appointment,"[16] and Pennell's March 2023 email to Sikora (embodied in Pennell's Employee Comment in the March 30, 2023 Final Warning) about the effect of the "toll" of travel on him.  (*Id.* at PageID# 105.)  TCC characterizes each communication as "descib[ing] only routine symptoms of minor or short-term

---

[15] In the text, Pennell wrote that he "caught the crud that's been making its way around" and that there was "no place to go but up for me in 2023."  (Doc. No. 16 at PageID# 105; Doc. No. 17-2 at PageID# 533.)

[16] Pennell represents that this communication could have taken place in January or February, although TCC writes as if it occurred in February 2023 because the Complaint referred to the communication as occurring "[i]n or around February 2023.)  (Pennell Depo. at Tr. 103:18-105:15; Doc. No. 23 at PageID# 1118; Doc. No. 1 at PageID# 3.)

ailments [that] did not provide information from which Sikora could reasonably infer a disability—nor does the ADA require employers to speculate on such matters." (*Id.* at PageID#s 105-06.)

In his Opposition, Pennell responds to each incident. As with his alleged October 2019 disclosure, Pennell asserts that in December 2022, he "specifically told Sikora that he was diagnosed with and suffered from depression and described to Sikora the severe symptoms caused by his depression" and that "he was on medication and under the care of a doctor." (Doc. No. 23 at PageID# 1118.)  He also argues that TCC must have been on notice because Miller transmitted information to Sikora about TCC's EAP services upon Sikora's request after Pennell and Sikora had their discussion on December 19, 2022.[17]  (*Id.*)

Pennell claims that his February 2023 telephone call to Sikora referenced not just an "appointment" but also "'his worsening symptoms' and medications."  (*Id.*)  Pennell attempts to situate his March 2023 email/Employee Comment in the context of other facts that allegedly indicate TCC was on notice, such as Sikora's request for a wellness check (which he had never done for another employee), Sikora making HR aware of the wellness check, Pennell's reference to "possible medical issues," Miller's email indicating suspicion of "something 'FMLA' related," and Pennell's May 1, 2023, 4:18 PM Email (regarding his upcoming appointment/mental health challenges) to Sikora the day before TCC fired him.  (*Id.* at PageID# 1119.)  Additionally, Pennell maintains that Sikora knew of his depression because he provided Pennell information about the EAP, and allowed Pennell to take PTO in late December 2022.  (*Id.*)  Pennell concludes that because TCC disputes that Pennell mentioned depression, a question of fact as to notice remains.  (*Id.*)

---

[17] Miller denies that Sikora told her that Pennell and Sikora discussed his depression, and that Sikora was only reaching out to Miller due to Pennell mentioning his divorce.  (*Id.*; Miller Depo. at Tr. 60:23-66:2.)

In TCC's Reply, TCC reiterates its contention that the record only shows "vague references or generalized symptoms" rather than a "treatment plan, physician-imposed work restrictions, or observable symptoms." (Doc. No. 24 at PageID#s 1135-36.)  TCC asserts that even if Pennell had mentioned "depression," that would not be enough to "trigger [TCC]'s duty under the ADA." (*Id.* at PageID# 1136.)  According to TCC, Sikora's "expressions of concern," i.e., allowing Pennell to take PTO in late December 2022 and requesting the wellness at the Convention are merely "vague assertion[s] of concern," which are not sufficient to provide notice. (*Id.* at PageID# 1137.)  Lastly, TCC argues that Pennell properly submitted notice at his subsequent job at RadioActive. (*Id.* at PageID# 1138.)

> **b)    TCC knew or had reason to know of Pennell's disability in October 2019 because Pennell attributed his severe symptom of crying during a business meeting to his diagnosis of depression and disclosed his treatment by medication.**

Viewing the facts and drawing all reasonable inferences in favor of Pennell, the Court concludes that Pennell has raised a genuine issue of material fact about whether TCC knew of Pennell's diagnosis for and severe symptoms associated with his depression.  The Sixth Circuit has recently set forth the following standard to assess when an employee has provided sufficient notice of his disability under the ADA to his employer:

> Although an employee is not required to use the word "disabled" to put his or her employer on notice, the employer still must "know enough information about the employee's condition to conclude that he is disabled.  Relevant information could include, among other things, a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions." *Cady v. Remington Arms Co.*, 665 Fed. Appx. 413, 417-18 (6th Cir. 2016) (internal citation omitted) (noting that there is not likely sufficient notice "[i]f the sole evidence of notice [is] a vague assertion of concern").  "The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999) (quoting *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998)).

*Hrdlicka*, 63 F.4th at 567.  "A general awareness of some symptoms is not enough to show that the defendant knew of the plaintiff's disability."  *Phipps v. Wieland Chase, LLC*, 2024 WL 2939069 at *9 (N.D. Ohio June 11, 2024) (quoting *Hrdlicka*, 63 F.4th at 567 (quoting *Messenheimer v. Coastal Pet Prods., Inc.*, 764 Fed. Appx. 517, 519 (6th Cir. 2019))).[18]  It is true, as TCC points out, that neither an employee's mere "mention of depression" nor the employer's "general awareness of some symptoms" of depression are sufficient to establish that the employer was on notice that the employee is disabled.  *See Hrdlicka*, 63 F.4th at 567; *Messenheimer*, 764 Fed. Appx. at 519.

TCC cites *Hrdlicka* and *Huge v. Gen. Motors Corp.*, 62 Fed. Appx. 77 (6th Cir. 2003), where the employees asserted discrimination based on their depression, but the court in both cases affirmed summary judgment for the employer.  But on this issue, the record here is different than the record in *Hrdlicka*, and *Huge* does not stand for the proposition for which TCC cites it.

First, in *Hrdlicka*, the court found notice lacking because the employee made only "one unsubstantiated statement that she was depressed without any corroborating medical evidence and without ever having sought medical help, and she consistently presented the issue [of her depression] as a workplace conflict, not a disability."  63 F.4th at 568.  Therefore, quoting *Cady*, the court concluded that the employee "failed to present any of the '[r]elevant information' that this court has found pertinent to determining if an employer was placed on notice of a disability."  *Id.* (quoting *Cady*, 665 Fed. Appx. at 417).

The record shows that Pennell claims that he met with Sikora and attributed his "weeping" to his diagnosis of depression (Pennell Depo. at Tr. 96:2), but Sikora denies that.  Yet "'courts neither

---

[18] *See also Abernathy v. TriHealth G LLC*, 2025 WL 689333 at *13 (S.D. Ohio Mar. 4, 2025) (applying *Hrdlicka*, *Cady*, and *Hammon*); *Penny v. Cottingham Retirement Community*, 2024 WL 3925667 at *12 (S.D. Ohio Aug. 22, 2024) (applying *Cady* and *Hammon*).

assess witness credibility nor weigh evidence at the summary judgment stage[,]'" *Harper v. Elder*, 803 Fed. Appx. 853, 856 (6th Cir. 2020) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 168 (6th Cir. 2011)), so this Court cannot resolve whether it is Pennell or Sikora who is accurately recalling whether Pennell attributed his weeping to his depression at the business meeting on October 23, 2019—instead the Court must instead "view the facts and draw all reasonable inferences in favor of [Pennell]." *Pittman*, 901 F.3d at 628.

The reasonable inference that Pennell attributed his weeping to his diagnosis of depression, when combined with Sikora's concession that he and Pennell discussed Pennell's medication, are together sufficient to raise a genuine dispute of material fact because, unlike in *Hrdlicka*, the record shows the "relevant information" referenced in *Cady*: "a diagnosis, a treatment plan, [and] apparent severe symptoms[.]"  *Hrdlicka*, 63 F.4th at 567 (quoting *Cady*, 665 Fed. Appx. at 417).  The employee in *Hrdlicka* relied on her contention that mentioning depression alone constitutes the severe symptom, *id.* at 568, but here, Pennell provides enough to satisfy *Cady*'s "relevant information."  He testified that he disclosed his "diagnosis of depression" to Sikora as an explanation for his ostensibly depressive episode at the business meeting in Scottsdale (Pennell Depo at Tr. 66:8-66:22 ["I was in tears sort of explaining this to [Sikora]"]), and at the same time, Sikora recalled that Pennell disclosed that Pennell was taking medication, which constitutes a treatment plan.  (Sikora Depo. at Tr. 27:20-27:22 ["I remember [] something about either [Pennell] stopped taking medication or the medication needed adjusted."].)

Second, *Huge* is not helpful to TCC.  Not only is *Huge* a non-binding, unpublished opinion predating *Hrdlicka*'s adoption of the standard from *Cady*, but *Huge* was analyzing whether the employer was entitled to summary judgment on the employee's "regarded as" claim, which is a

specific category of ADA discrimination claim where the employee alleges that even if their disability does not actually "substantially limit[] one or more of the major life activities[,]" under 42 U.S.C § 12102(1)(A), their "disability" under the ADA was instead simply "being ***regarded as*** having such an impairment" under § 12102(1)(C).  In the paragraph where the court in *Huge* held that the employee failed to show she was "disabled" within the meaning of the ADA, the court cited to *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 938 (6th Cir. 2000), which explains the difference between a "regarded as" claim, and a claim based on an actual impairment:

> Furthermore, we reject Plant's contention that he was "regarded as" disabled within the meaning of 42 U.S.C. § 12102(2).  Plant has come forward with no evidence to show that he fits within this definition of disabled, other than to suggest that because Morton made accommodations for Plant's medical restrictions, it viewed him as disabled.  This is clearly not the kind of situation to which the statutory provision for those who are "regarded as" disabled was intended to refer.  Rather, the EEOC regulations explain that this definition of disability applies when the employee has an impairment that is not substantially limiting but is treated as substantially limiting, or when the impairment is limiting only because of others' attitudes, or when the employee has no impairment at all but is viewed as having a substantially limiting impairment by the employer.  *See* 29 C.F.R. § 1630.2(*l*).  The intent behind this provision, according to the EEOC, is to reach those cases in which "myths, fears and stereotypes" affect the employer's treatment of an individual.  29 C.F.R. § 1630.2(*l*) App.  Plant cannot show that this provision applies to him merely by pointing to that portion of the record in which his supervisor admitted that he was aware of Plant's medical restrictions and modified Plant's responsibilities based on them.

*Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 938 (6th Cir. 2000); *see also Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019) ("[T]o state the threshold condition of a 'regarded as' ADA claim, an employee need only show that their employer ***believed*** they had a 'physical or mental impairment,' as that term is defined in federal regulations.") (emphasis added).

Relying on the last sentence of that quote from *Plant*, the court in *Huge* held that

> Huge has not shown that GMC regarded her as having an 'impairment that substantially limits one or more of the major life activities.' 42 U.S.C. § 12102(2).  In fact, she puts forth no evidence that GMC regarded her as having any impairment.

> Huge points to evidence that GMC was aware of her depression. She seems to assume that because of this, GMC regarded her as having a disability. A plaintiff "cannot show that [his employer regarded him as disabled] ... merely by pointing to that portion of the record in which his supervisor admitted that he was aware of [plaintiff's] medical restrictions and modified [plaintiff's] responsibilities based on them."

62 Fed. Appx. at 80-81 (quoting *Plant*, 212 F.3d at 938). The language in *Huge* that "[s]he seems to assume, that because of [the 'evidence that GMC was aware of her depression'], GMC regarded her has having a disability" does not speak to what facts are sufficient to put an employer on notice of an employee's disability in a non-'regarded as' context. *See id.* at 80. Rather, *Huge* stands for the proposition that the mere fact that the employer is aware of the employee's depression is not, by itself, sufficient to show that the employer "regarded" the employee as "disabled" within the meaning of the ADA—but not that the employer's awareness of the employee's depression is insufficient to put the employer on notice of the employee's disability. *Id.* Mere awareness, in other words, may be insufficient to meet the 'regarded as' definition necessary to succeed on a 'regarded as' claim, and yet still sufficient to put an employer on notice, as Pennell contends he did. That is true because an employer may be legally on notice that an employee is disabled even if the employer does not, in reality, regard the employee as disabled.[19]

Therefore, viewing the facts in favor of Pennell, TCC had sufficient information to conclude that Pennell was disabled based on his depression because Sikora learned of Pennell's diagnosis of depression and his medication-based treatment plan, and observed his symptom of spontaneous weeping during a business meeting. *See Hrdlicka*, 63 F.4th at 567 (quoting *Cady*, 665 Fed. Appx.

---

[19] Pennell's Complaint includes both theories, which is why the distinction matters: "Mr. Pennell thus suffers from one or more disabilities and/or was regarded as suffering from one or more disabilities within the meaning of 42 U.S.C. § 12102." (Doc. No. 1 at PageID# 6.) *Huge* establishes that mere awareness is not enough to establish that the employer "regarded" the employee as disabled, which defeats a theory of liability under § 12102(1)(C); but here, TCC does not dispute that Pennell is disabled. Thus, although *Huge* may defeat Pennell's 'regarded as' theory of liability (which neither party develops), *Huge* does not defeat his other theory, i.e., that he put TCC on notice of his disability qualifying under the *other* provision of the statute, § 12102(1)(A).

26

at 417).  Accordingly, the Court concludes that Pennell has established a *prima facie* case for his disability discrimination claim.

> ### 2.      TCC had a legitimate non-discriminatory reason for its adverse action and TCC's preferred basis is not pretextual.

As noted above, "[o]nce the employee establishes a *prima facie* case of discrimination, 'the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action.'" *Moore*, 2025 WL 3025607 at *4 (quoting *Thompson*, 985 F.3d at 522).

TCC argues that it fired Pennell not because of his depression, but because of Pennell's "repeated and well-documented performance and attendance deficiencies[,]" citing his failure to submit his sixteen (16) Store Visit Reports for November 17, 2022 - December 19, 2022, the fact that he was a "no call, no show" to "nearly all of the March 2023 Company Convention," and  his failure to attend the mandatory May 1, 2023 Team Meeting at 10:00 AM without providing advanced notice after he signed the March 30, 2023 Final Written Warning.  (Doc. No. 16 at PageID#s 106-07.)

In his Opposition, Pennell responds that TCC's "shifting reasons are pretextual" because although TCC claims it fired Pennell due to his "excessive" absenteeism, "excessive" is not defined in TCC's employee handbook and TCC does not track attendance for salaried employees, and Sikora excused him from previous team calls when he cited non-depression-related reasons.  (Doc. No. 23 at PageID#s 1119-20.)  Pennell contests that his performance was deteriorating after the March 30, 2023 Final Written Warning because he remained in compliance with his Store Visit Report requirement after failing to submit the reports in December 2022, maintains that the dealer he worked with (Delaney) did not complain of his lack of Store Visit Reports, and contends that TCC failed to produce discovery evidence that shows that other Regional Managers successfully submitted their

own Store Visit Reports.  (*Id.* at PageID#s 1120-21.)  That, Pennell asserts, also amounts to a "shifting explanation" because TCC's original reason was his "excessive absenteeism," not failing to conduct the store visits.  (*Id.*)  Finally, he maintains that the testimonies of Sikora and Miller conflict with their email exchange the evening of May 1, 2023, because Sikora's email "does not give any indication that a decision to terminate had already been made and asks for further discussion about [Pennell]."  (*Id.*)

In its Reply, TCC replies that the March 30, 2023 Final Written Warning did not trigger Pennell's termination, but was merely the "first step in a progressive series of documented concerns."  (Doc. No. 24 at PageID# 1140.)  TCC notes that while "excessive" is not defined, Pennell acknowledged in his deposition that attendance was mandatory.  (*Id.*)  And, according to TCC, Sikora's previous accommodations for Pennell's previous non-disability-related absences were made only "if [Sikora] knew about it ahead of time."  (*Id.*)[20]  TCC also responds that it decided to terminate Pennell before he sent his 2:03-2:17 PM texts and his 4:18 PM Email on May 1, 2023, none of which referenced his "depression" or requested an accommodation.  (*Id.*)

Although the parties do not clearly delineate which step of the *McDonnell Douglas* framework they analyze, the Court will first address whether TCC has set forth a legitimate, non-discriminatory basis for firing Pennell (step two), and then address whether TCC's preferred basis is merely pretextual (step three).

---

[20] Although TCC cites "Pennell Tr. at Exhibit 12" for this proposition, that document is Pennell's May 1, 2023, 4:18 PM Email, and does not mention anything about whether Sikora excused absences that he knew about ahead of time.  (Doc. No. 17-2 at PageID# 469.)  Instead, Pennell's testimony to that effect is located on Page 154 of Pennell's Deposition. (Pennell Depo. at Tr. 154:8-154:19.)

28

a)      **Pennell's absences and poor performance are legitimate non-discriminatory reasons for terminating Pennell.**

For the following reasons, the Court concludes that TCC has met its burden under step two of the *McDonell Douglas* framework.

Sixth Circuit precedent squarely establishes that unauthorized absences, excessive tardiness, and poor work performance are legitimate, nondiscriminatory reasons for an adverse employment action. *Bashaw v. Majestic Care of Whitehall, LLC*, 130 F.4th 542, 550 (6th Cir. 2025) ("Unauthorized absences from work are a valid reason for termination.  As is excessive tardiness.") (citations omitted); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008) ("Poor performance is a legitimate, nondiscriminatory reason for terminating a person's employment[.]"); *Potoma v. Cleveland Clinic Found.*, 2025 WL 948023 at *15 (N.D. Ohio Mar. 28, 2025) (same).

Here, it is undisputed that part of Pennell's job included submitting approximately sixteen (16) Store Visit Reports per month, that Pennell frequently failed to meet it, and that he did not submit any from November 17, 2022 through December 19, 2022.  (Pennell Depo. at Tr. 87:5-88:5) ("A.  The 16 minimum store visits was often subject to change.  Q.  Meaning what?  A.  Depending on situations happening within our region.  Frequently the 16 suggested minimum number was not obtained by myself and others.").  Accepting Pennell's characterization of the sixteen-report (16) threshold as a 'suggested minimum' but not a mandatory requirement, the Court finds that such a 'suggested minimum' would therefore amount to a performance target or goal, as Sikora alluded to in his deposition:  "Q.  Was there – before [the December 6, 2022] meeting another – a previous goal or minimum?  A.  We felt like it was always right around that 16 number."  (Sikora Depo. at Tr. 31:11-31:16.)  Pennell faults TCC for not producing evidence that TCC similarly disciplined other Regional Managers, but Pennell did not produce any contrary evidence.  Despite Pennell's

unsupported testimony that other Regional Managers did not meet the 16-store-visit goal, he does not produce evidence in support of his supposition that he was treated any differently than other Regional Managers. That is insufficient to show that TCC's initial disciplinary action was discriminatory.

Second, it is undisputed that Pennell understood that he was required to attend the March 2023 Convention.  (*See* Pennell Depo. at Tr. 109:17-109:19) ("Q. And so the commitment to be at the conference was Sunday, Monday, Tuesday?  A. Yes.").  While he missed the events on Sunday, March 26, 2023, due to poor weather, and attended most of the events during the day on Monday, March 27, 2023,  (*Id.* at Tr. 111:8-119:10), he "forgot" to be a guide during lunch and "forgot" about the 6:15 after-hours event (*Id.* at Tr. 120:11-121:2), and he 'no-call no-showed' to all of the events Tuesday, March 28, 2023.  (*Id.* at Tr. 119:16-119:17 ["Q.  Did you attend any of the sessions on Tuesday.  A.  I did not."]; Doc. No. 23 at PageID# 1113 [Pennell admitting that because "he had missed the day's events, [he] went to the airport to return home."].)   He also conceded that less than (five) 5 weeks later, on May 1, 2023, he "fell asleep and missed a regularly scheduled 10:00 AM call with Sikora and his team."  (Doc. No. 23 at PageID# 1115.)

Because poor performance and attendance are legitimate, non-discriminatory reasons for disciplining Pennell, TCC has met its initial burden under the *McDonnell Douglas* framework. *See Imwalle*, 515 F.3d at 546.

### b)  TCC's proferred basis for taking adverse action against Pennell was not pretextual.

For the following reasons, the Court concludes that Pennell has not met his burden to show that TCC's basis for firing him was pretextual.

"A plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Strickland v. City of Detroit*, 995 F.3d 495, 512 (6th Cir. 2021); *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).  Pennell relies on the second theory, because he claims that "[a] jury could conclude that once Sikora believed that Josh's depression and resulting symptoms would be chronic and more frequent, Sikora made the decision to terminate Josh rather than accommodate him."  (Doc. No. 23 at PageID# 1120.) However, "'these are not the only ways that a plaintiff can establish pretext; these three categories are simply a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?'"  *Patel v. Trinity Health Corp.*, 2021 WL 4894637 at *16 (E.D. Mich. Oct. 20, 2021) (quoting *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020)) (internal quotations omitted).

Pennell implausibly maintains that the Court can infer Sikora's discriminatory motivation from the fact that Pennell's performance did not deteriorate after December 22, 2022.  (Doc. No. 23 at PageID# 1121.)  Pennell presents no evidence that Sikora was motivated by Pennell's disability when he issued the December 20, 2022 Corrective Action, because it was, obviously, only after Pennell failed to meet his performance expectations that Sikora attempted to correct his behavior. (Doc. No. 16-3 at PageID# 218.)  Pennell claims he mentioned the "effects of depression" to Sikora, but Sikora responded by *accommodating* him, encouraging him to take time off at the end of December, not *escalating* the discipline in response to hearing about his depression.  (Pennell Depo. at Tr. 138:1-138:7.)  In other words, first, Sikora initiated a disciplinary conversation based on Pennell's performance issues, then, when Pennell revealed that his failure was caused by his

31

depression, Sikora relaxed the discipline by giving Pennell another chance to improve and encouragement to take a break.  (*Id.*)  That is not enough to show that the December 20, 2022 Corrective Action was based on Pennell's depression, but instead shows that it was based on Pennell's lackluster performance.

Pennell cites *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409 (6th Cir. 2020) for the proposition that "absences cannot be used to show [that an] employee is unqualified 'if the absenteeism is caused by an underlying failure to accommodate a disability[,]'" but *Fisher* does not help him show pretext. (Doc. No. 23 at PageID# 1120) (quoting 951 F.3d at 418).  Pennell misreads *Fisher*.  The court in *Fisher* was not discussing whether termination for absences preventable by accommodations showed evidence of a pretextual basis (i.e., the plaintiff's necessary showing under step three of the *McDonnell Douglas* framework), but rather whether absenteeism itself shows that the employee is *unqualified* (i.e., one of the elements of the plaintiff's *prima facie* case under step one of the *McDonnell Douglas* framework).  The logic of *Fisher* is straightforward and uncontroversial: an employer cannot fail to accommodate an employee, then cite the employee's failure to perform unaccommodated to prove he was not qualified for the job.  *See* 951 F.3d at 409 (commenting that firing a wheelchair-bound teacher for failing to show up for class on the second floor of the school after denying his request for placement on the first floor could not be evidence that the teacher was not qualified to teach).  Yet that logic has no relevance here where TCC does not dispute that Pennell was qualified for his role, but only that TCC offered a pretextual basis for firing Pennell based on his poor performance and repeated attendance failures.  Pennell conflates his underlying qualification for his position with his performance, but they are clearly not identical components of

32

the *McDonnell Douglas* analysis because an employee can be qualified for a job even if he subsequently fails to show up for work or underperforms in that job—as Pennell has done here.

Next, Pennell accurately points to evidence that Sikora gladly accommodated non-depression-related absences.  (*See supra*, Section I.C.)  Those include times when Pennell had a bad reaction to a vaccine, hurt his back, was "feeling like crap," had a general inability to sleep, or reported his need to reschedule an appointment. (Doc. No. 17-3 at PageID#s 491, 495, 504-05, 507, 522.)  In every one of those instances, TCC explains that Pennell gave advanced notice, unlike the missing Store Visit Reports from November 17, 2022 – December 19, 2022, Pennell's absences at the March 2023 Convention, and missing the 10:00 AM meeting on May 1, 2023.   Rather than any evidence of a discriminatory motive, Sikora's positive reaction revealed in those text messages corroborates what Pennell ackowledged in his deposition:

> Q.  And there's nothing in any of these text messages about mental health struggles?
>
> A.  That's correct.  I didn't think it was appropriate to text things like that.
>
> Q.  And if there were times when you had an appointment for whatever reason, Tom never pushed back on that, correct?
>
> A.  Correct.
>
> Q.  And in these text messages, if you told Tom you were sick or not feeling well, he was generally supportive, right?
>
> A.  If he knew about it ahead of time, yes.

(Doc. No. 24 at PageID# 1140; Pennell Depo. at Tr. 154:8-154:19.)  Thus, rather than establishing any discriminatory motive on behalf of Sikora, Pennell's own testimony undisputably shows that Sikora accommodated Pennell's absences when Pennell gave Sikora advanced notice, and that it was Pennell's failure to do so on May 1, 2023 and the previous instances that led to his termination.  (*Id.*)

Lastly, Pennell has failed to show evidence of a shifting pretext. Pennell's assertion that TCC "never mentioned any reason for terminating Josh other than excessive absenteeism" fails to acknowledge that it was Pennell's successive failures to perform his job—from November 17 - December 19, 2022 and then at the March 2023 Convention that led to his final absence on May 1, 2023 resulting in his termination. His failure to submit Store Visit Reports, Pennell conceded during his deposition, was because he "sometimes did not reach the 16 visit number that was suggested." (Pennell Depo. at Tr. 89:6-90:5.) To the extent Pennell was "absent" from the stores he was expected to visit in November 2022 and December 2022 because he did not achieve "16 minimum store visits completed," as noted on his December 20, 2022 Corrective Action, that too amounted to absenteeism. (*Id.*; Doc. No. 17-2 at PageID# 470.) Indeed, he requested to use PTO—paid time off—to avoid discipline.

Pennell emphasizes that on May 1, 2023, Sikora sent his 5:54 PM Email to Miller asking for when she "had time to chat about Josh Pennell" and noting that in his 4:18 PM Email Pennell had informed Sikora of Pennell's upcoming doctor's appointment. (Doc. No. 18-2 at PageID# 675; Doc. No. 23 at PageID# 1116.) Yet both of them offer undisputed and corroborating, not conflicting, testimony that they had spoken prior to Miller's 4:18 PM email. Sikora and Miller both offered consistent testimony that they had already decided to fire Pennell before Sikora received Pennell's 4:18 PM Email, and that the 5:54 PM Email served as a recap of the conversation they had before Sikora's receipt of the 4:18 Email:

> Q. Did she specifically ask you on May 1st, during your conversation with her, to send her a recap email?
>
> A. Yes.

Q.  Okay.  And so during that conversation with Ms. Miller, did you talk about any other options for Mr. Pennell other than termination?

A.  No.

(Sikora Depo. at Tr. 86:7-86:14.)  Miller's testimony corroborates Sikora's recollection:

Q. . . . What was discussed during that call?

A.  . . . . That Josh had missed a mandatory meeting and was already on a final. And then proceeded to send a text message later, like did not respond to Tom's initial text messages.  He waited hours to respond to that text message, and when he responded, he said he slept through his alarms.

Q.  Okay.  Anything else you discussed during that conversation?

A.  We did discuss next steps.

Q.  Okay.  And what next steps did you discuss?

A.  Termination because he was already on a final written warning for attendance.

(Miller Depo. at Tr. 82:5-82:20.)  She further testified:

[Pennell's email] came in after [Sikora] and I had already had the discussion about separating with Mr. Pennell.  This is after the fact that we had already made the decision.  [Sikora's 5:54 PM Email] is a recap of what happened during the day.  And then this came in after the decision was already made to separate him, and that attachment is the e-mail that he sent after the decision was made to separate him.

(*Id.* at Tr. 83:13-21.)  Thus, the uncontroverted testimony from the two participants in that discussion demonstrates that Sikora's 5:54 PM email on May 1, 2023, was simply a "recap" of the conversation they had already had during which they had decided to terminate Pennell.  Pennell offers no evidence to rebut the testimonies of Sikora and Miller on this issue and has no personal knowledge concerning the conversation between Sikora and Miller.  Pennell merely claims or asserts that it was only after Pennell sent his 4:18 PM Email mentioning mental health issues that Sikora decided to terminate him.  However, his unsubstantiated claim or assertion raises only a "possibility" of a genuine dispute

35

of material fact about TCC's discriminatory intent, which is insufficient to survive summary judgment.  *See Davis v. Ermco Mfg.*, 215 F.3d 1325, 2000 WL 687688 at *7 (6th Cir. 2000) ("The 'mere possibility' of a factual dispute is not enough to overcome summary judgment.") (citation omitted); *Cesari v. Sunrise Med., Inc.*, 2010 WL 11667843 at *3 (N.D. Ohio Mar. 31, 2010) (same).

Accordingly, for the reasons set forth above, the Court concludes that Pennell has met his burden under step one of the *McDonnell Douglas* framework, TCC has met its burden under step two, but Pennell has failed to raise a genuine issue of material fact that TCC's preferred basis for firing Pennell (his poor performance and unexcused absences) was merely pretext for discrimination based on his disability.  Therefore, TCC is entitled to judgment on Counts I and II.

### B.      Failure to Provide Reasonable Accommodation Claims (Counts III and IV)

Pennell asserts "Failure to Provide Reasonable Accomodation" claims under 42 U.S.C. § 12112 (Count III) and Ohio Rev. Code § 4112.02(A) (Count IV).  (Doc. No. 1 at PageID#s 8-9.) [21]

### 1.      Summary of the Parties' Arguments

TCC argues that Pennell never requested an accommodation for his disability.  (Doc. No. 16 at PageID#s 108-111.)  TCC contends that Sikora did not deny Pennell's request to take time off in December 2022, and instead permitted him to do so.  (*Id.* at PageID# 108.)  According to TCC, Pennell "does not identify any instance where [Pennell] requested leave and TCC denied such request."  (*Id.* at PageID#s 108-09.)  TCC also argues that although TCC denied Pennell's March 30, 2023, request to retroactively apply his available PTO to cover his absences at the March 2023 Convention, TCC had no obligation to approve such a request because the ADA only requires "prospective" accommodations.  (*Id.*) (quoting *Lockhart v. Marietta City Sch.*, 2021 WL 4810172

---

[21] As noted in Section IV.A above, the Court analyzes ADA claims and Ohio Rev. Code § 4112.02(A) under the same standard.  *See Brune & Ashing*, 234 F.3d at 1267 (citation omitted).

at *11 (6th Cir. Oct. 15, 2021) ("The relevant EEOC guidance explains that "[a]n employer must make reasonable accommodation to enable an otherwise qualified individual with a disability to meet . . . conduct standard[s] in the future," but "[b]ecause reasonable accommodation is always prospective . . . an employer is not required to excuse past misconduct.") (brackets in original). TCC also relies on *Yarberry v. Gregg Appliances, Inc.*, 2014 WL 4639149 (Sept. 16, 2014), *aff'd on other grounds*, 625 Fed. Appx. 729 (6th Cir 2015), for the proposition that a plaintiff must request an accomodiation "prior to" the adverse action. (*Id.* at PageID# 110.)

In his Opposition, Pennell argues that TCC's knowledge of Pennell's disability and his need for accommodation triggered TCC's obligation to "engage in an[] interactive process" even without an express request. (Doc. No. 23 at PageID# 1122.) He cites *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 560 (6th Cir. 2022), where the court wrote that "[r]equests for retroactive leave are not *per se* unreasonable, and we have recognized employers' practices of granting retroactive leave in unforeseeable situations like this[,]" to demonstrate that Pennell's requests for retroactive PTO leave to avoid discipline in December 2022 and March 2023 were reasonable accomodations. (*Id.* at PageID# 1122.) Finally, Pennell claims that TCC failed to discuss an accommodation with Pennell before it terminated him on May 2, 2023 after receiving his 4:18 PM Email on May 1, 2023 referring to his "mental health challenges." (*Id.* at PageID# 1124) (citing *Rorrer v. City of Stow*, 743 F.3d 1026, 1040-41 (6th Cir. 2014)).

In its Reply, TCC responds that the ADA requires the employee to explain that the "request is being made because of their disability[,]" *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008)), and Pennell did not provide any such explanation. (Doc. No. 24 at PageID# 1141.) TCC distinguishes *King* by arguing that the Sixth Circuit's holding narrowly

37

focused on the particular circumstances of the employee in that case, but here, Pennell "never applied for leave, did not have a history of taking leave to manage his disability, never submitted any documentation from his treating physician, and never advised TCC that he had a condition that might require future absences—let alone emergency leave." (*Id.* at PageID#s 1141-42.) And TCC argues that the other cases Pennell cites are distinguishable because in each of those cases, the employee's request for leave was more specific and the employee took more proactive steps to communicate their condition. (*Id.* at PageID# 1143.)

> **2.** **Pennell failed to show that he made a request for reasonable accommodations to TCC, so TCC did not violate its duty to engage in an interactive process to accommodate his disability.**

As a threshold matter, the Court must clarify the applicable legal framework through which to assess Pennell's "Failure to Provide Reasonable Accomodation" claims.

The Court interprets Pennell's Opposition as resting his legal theory on TCC's alleged failure to engage in the required "interactive process." (Doc. No. 23 at PageID#s 1121.) Pennell titles that section, "TCC knew that Josh suffered from disabling conditions but failed to engage in any interactive process to accommodate him." (*Id.*) As Pennell notes, "[t]o establish a prima facie claim for failure to accommodate, a plaintiff must show that (1) [he] was disabled within the meaning of the the statute, (2) [he] was otherwise qualified for h[is] position, with or without reasonable accommodation; (3) the defendant knew or had reason to know about [his] disability; (4) [he] requested an accommodation; and (5) the defendant failed to provide the necessary accommodation." *King*, 30 F.4th at 560 (citation omitted); *Crispell v. FCA US, LLC*, 2024 WL 3045224 at *8 (6th Cir. June 18, 2024) (same).

In his Opposition, Pennell then links that framework to his "failure to engage in an interactive process" theory of liability, writing that "[a]s discussed above, as to element 3, it is a question for the jury as to whether TCC knew or had reason to know of Josh's disability.  As to elements 4 and 5, employers are required to engage in an interactive process with employees to identify and implement appropriate, reasonable accommodations."  (Doc. No. 23 at PageID# 1121.)  The Court has already found that there is a genuine dispute of material fact as to whether Pennell provided notice to TCC, *see supra* Section IV.A.1.b., so the Court agrees with Pennell that only elements 4 and 5 remain at issue.

From there, however, Pennell appears to mistakenly assume, citing to *Smith*, that "[t]he interactive process is triggered by a request for accommodation, **_or_** by the employer's recognition of the need for accommodation."  (*Id.* at 1121-22) (emphasis in original) (citing 376 F.3d at 535-36). In other words, Pennell claims he satisfies elements 4 (making a request for an accomodation) and 5 (failing to provide it) because Pennell triggered TCC's duty to "engage in the interactive process" when it "recogni[zed]  [his] need for accommodation" but TCC failed to engage in that process.

The Court cannot accept Pennell's framework.  Framing the triggering condition for the duty to engage in an interactive process as Pennell does ignores the requirement, repeatedly explained by the Sixth Circuit as set forth below, that the employee must actually make a "request for reasonable accommodations."

> **a)**  **An employee must make a request for reasonable accommodations to trigger the employer's duty to engage in an interactive process.**

First, *Smith* does not support his contention that "the employer's recognition of a need for accommodation" is independently sufficient, even without a "request for accommodation" to trigger

39

TCC's duty to engage in the interactive process.  In fact, it stands for just the opposite. That case involved an employee, Smith (her title was "Tour I Supervisor"), who sent a letter to her superior, Mullin, asking "if she could delegate her financial accounting duties to a subordinate, as other Tour I Supervisors had done in the past."  376 F.3d at 535.  "Since it is undisputed that the accounting duties were time-consuming and Mullin was aware of Smith's disability [arthritis] and her need to work restricted hours, a factfinder could infer that *Smith's letter constituted a request for an accommodation* that would have substantially shortened her work day, in line with her medical restrictions."  *Id.* (emphasis added).  The court went on to explain that although Smith's "letter did not use the word 'accommodation' or specifically mention that she was seeking to delegate the accounting function because of her disability[,]" "Mullin was well aware of Smith's disability and her need for a medical restriction[,]" and Mullin even "told Smith that her medical accommodation would no longer apply to her job as a Tour I Supervisor."  *Id.* at 535-36.  The court held that

> [t]aken together, these facts create a genuine issue of material fact as to whether the May 3, 1998 letter, which sought to delegate the accounting duties, was a ***request for a reasonable accommodation that triggered the USPS's obligation to participate, in good faith, in an 'interactive process with Smith as to potential reasonable accommodations*** . . . According to Smith, Mullin rejected her proposed accommodation, telling her that she was 'now in a man's world' and 'accusing her of 'always whining.'  Thus, if a jury were to find that Smith's May 3, 1998 letter constituted a ***request for a reasonable accommodation***, there appears to be little dispute that the USPS flatly denied that request.

*Id.* at 536 (citations omitted) (emphasis added).  At no point in *Smith* does the court suggest that a "request for a reasonable accommodation" can be dispensed with.  Rather, *Smith* stands for the proposition that sending a letter requesting permission to delegate certain job functions *is* a "request

for a reasonable accommodation," and that such a request "triggered the [defendant's] obligation to participate, in good faith, in an interactive process[.]" *Id.*[22]

Other Sixth Circuit precedent shows that the triggering condition for an employer's duty to "engage in the interactive process" is a "***request*** for a ***reasonable*** accommodation." In *Hrdlicka* the court explicitly noted that the requested accommodation must be reasonable:

> General Motors did not violate a duty to engage in an interactive process because the duty is an independent violation of the ADA only 'if the plaintiff establishes a *prima facie* showing that he proposed a reasonable accommodation.' *Id.* at 1041. ***As discussed above, Hrdlicka did not request a reasonable accommodation and, therefore, General Motors did not fail to engage in an interactive process.***
>
> Hrdlicka has ultimately failed to establish a failure-to-accommodate claim because she did not identify a ***reasonable*** accommodation.

*Hrdlicka*, 63 F.4th at 572 (quoting *Rorrer*, 743 F.3d at 1041) (emphasis added).[23] In *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 307 (6th Cir. 2016), the court likewise wrote that "[t]o make out a claim for the denial of a reasonable accommodation, an employee must first show that he proposed an accommodation and that the desired accommodation is objectively reasonable." *Id.*

---

[22] Pennell also cites *Morrissey v. Laurel Healthcare Co.*, 946 F.3d 292, 300 (6th Cir. 2019) for the proposition that "If an employer knows of an employee's disability and need for accommodation, the employer has an obligation to provide the accommodation, ***even without an express request for a modification or a medical diagnosis.***" (Doc. No. 23 at PageID# 1122) (emphasis in original). This case also does not absolve Pennell of a requirement to make a request for a reasonable accommodation before triggering the duty to engage in an interactive process. The court in *Morrissey* expressly found "[t]he record shows that Morrissey asked Coldwater for an accommodation due to her disability, and Coldwater did not accommodate her." *Id.* at 302. While it is true that *Morrissey* does establish, as Pennell contends, that a "specific diagnosis" is *not* required to provide "notice" of the disability, the Court has already concluded that construing the evidence in a light most favorable to him, Pennell provided "notice" of his disability to TCC under *Cady*. *See id.* at 300 (citing *Cady*'s standard for notice) ("[S]he did not *have* to tell Coldwater about her specific diagnoses. Morrissey told Coldwater that she could not work more than twelve hours per shift because she suffered from a disability as defined by the ADA. That was enough."); *see also supra* Section IV.A.1.b. The question at this stage of the inquiry is not whether TCC had "notice" of Pennell's disability—construing the evidence in the light most favorable to Pennell, it did—but instead whether Pennell requested a reasonable accommodation.

[23] *See also Longergan v. Gallagher Sharp, LLP*, 2025 WL 2578155 at *6 n.12 (N.D. Ohio Sept. 5, 2025) (Barker, J.) ("Rather, the [*Rorrer*] court simply indicated that the interactive process only supports independent liability if the plaintiff establishes a prima facie showing that he *proposed a reasonable accommodation*—in other words, that it is the proposal of reasonable accommodations that triggers the interactive process.") (emphasis in original).

41

(quoting *Talley*, 542 F.3d at 1108); *see also Yanick v. Kroger Co. of Mich.*, 2024 WL 1856680 at *4-6 (6th Cir. Apr. 29, 2024) (dividing its analysis into two sub-sections based on "did Yanick make a request?" and "was Yanick's accommodation request reasonable?").

Admittedly, in *King*, the court set forth its standard (under its analysis titled "Plaintiff Requested an Accomodation") without using the word "reasonable": "'[o]nce an employee requests an accommodation, the employer has a duty to engage in an interactive process' to try to determine whether the employer can accommodate the employee's disability.'" *King*, 30 F.4th at 564 (quoting *Fisher*, 951 F.3d at 421). And the court in *King* underscored that "an employee's initial request does not need to identify the *perfect* accommodation from the start." *Id.* (quoting *EEOC v. Ford Motor Co.*, 782 F.3d 753, 779 (6th Cir. 2015) (en banc) (Moore, J., dissenting)) (emphasis added). But *Crispell*—which Pennell himself cites as providing the applicable framework—harmonizes *King* with *Hrdlicka* by quoting the five-factor test from *King* and then immediately quoting *Hrdlicka* in the next sentence: "'The requested accommodation must also be objectively reasonable.'" *Crispell*, 2024 WL 3045224 at *8 (quoting *Hrdlicka*, 63 F.4th at 570). Based on that authority, to determine whether TCC violated its duty to engage in the interactive process with Pennell, the Court must determine whether Pennell triggered that duty by analyzing (1) whether Pennell *requested* an accommodation, and if so, (2) whether Pennell requested a *reasonable* accommodation.

Regarding the first requirement, the Sixth Circuit's standard in *King* sets forth what qualifies as a "request" under the ADA:

> The employee bears the "initial burden of requesting an accommodation." *Gantt*, 143 F.3d at 1046. "We have generally given plaintiffs some flexibility in how they request an accommodation." *Mobley v. Miami Valley Hosp.*, 603 Fed. Appx. 405, 413 (6th Cir. 2015) (citing *Talley v. Family Dollar Stores, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008)). Just as an employee does not need to use "magic words" to inform her employer that she is disabled, the employee does not need to explicitly use the word

"accommodation."  *Leeds*, 249 Fed. Appx. at 449 (citing *Smith*, 376 F.3d at 535). Medical documentation is not required.  *See Mobley*, 603 Fed. Appx. at 413 (citing *Talley*, 542 F.3d at 1108).  A plaintiff's own requests, whether written or oral, can satisfy this element.  *See id.* (citing *Talley*, 542 F.3d at 1108).

*King*, 30 F.4th at 564 (citations in original).

However, the second requirement, that the accommodation requested itself be "reasonable," requires more.  The parties here dispute whether Pennell's request for a "retroactive" accommodation was reasonable.  Pennell is correct that *King* recognized that not all requests for retroactive accommodations are necessarily unreasonable.  *See* 30 F.4th at 562-63.  But the court in *King* was careful to limit that holding to factual predicates entirely absent from Pennell's case.

In *King*, a nurse faced a severe  asthma flare-up that began in April 2017 and lasted through June 2017, when she was terminated by the hospital at which she worked.  *Id.* at 557.  King had to visit the emergency room for her asthma attack on May 15, 2017, and after that day, she called in sick for fourteen (14) shifts "at least two hours before each shift and reported that she could not work because of her asthama flare-up."  *Id.*  Beginning on May 19, 2017, she also told her supervisors and others at the hospital that "she was trying to get the leave, but hadn't gotten it yet, so she was reporting off again for the next day."  *Id.*  Additionally, beginning on May 19, 2017, she called the hospital's third-party administrator to "request the leave[,]" but the administrator denied her request, claiming she was ineligible because she had not worked enough hours in the prior year.  *Id.*  The administrator then told her to contact a member of the hospital's HR department, Burns.  *Id.*  Burns told King that the administrator lacked an "accurate count of King's hours because the Hospital recently changed management, and King's hours had not been properly carried over to the new systems."  *Id.* at 558.  "Burns said she would correct this mistake and follow up with King."  *Id.* After a week, King called her supervisor, Bungard, and, informed him of her conversation with

Burns, and "told him she was trying to apply for the hospital's medical leave and FMLA." *Id.*
Bungard too "said he would investigate and get back to" King. *Id.* By May 30, 2017, having not
heard back from the administrator, Burns, or Bungard, King called the administrator "to see if the
hours had been corrected so she could apply for the leave." *Id.* (brackets omitted). As of June 2,
2017, neither the administrator, Burns, nor Bungard had contacted King, but Bungard still fired her
that day for "failure to apply timely for a leave of absence." *Id.* The court noted that "she had not
been able to apply for leave, and therefore, she had not received an approved leave of absence." *Id.*

On June 5, 2017, King again called the administrator, who told her that it had corrected her
hours but she was still ineligible for FMLA leave, although it "sent King a letter on June 5 saying
that it was considering her request for leave" and requested certification from her physician. *Id.* On
June 6, 2017, her physician faxed the medical certification to the administrator indicating that "King
needed medical leave from April 28 to June 1" due to her "chronic health condition." *Id.* Only then,
after the administrator received the physician's medical certification, did the administrator
"retroactively approve[] part of King's request," and on June 22, 2017, tell "King that she was
entitled to non-FMLA leave because of her asthma." *Id.* The administrator "ha[d] 'a five-day look
back period when making determinations regarding unforeeable leaves" such that "an employee was
generally granted leave for up to five days prior to the day the employee first requested leave." *Id.*
When she "called [the administrator] and said that she had applied for leave on May 19[,] [the
administrator] adjusted the look back period and retroactively approved King's request for leave
from May 14 to June 1" but "denied her request for leave from April 28 to May 13 because King
'did not provide sufficient notice for leave.'" *Id.* "Despite retroactively approving periods of non-
FMLA leave, nothing about this decision affected King's termination on June 2." *Id.*

44

The court noted that "medical leave can constitute a reasonable accommodation" and noted three considerations for assessing the "reasonableness of the leave request": "(1) the amount of leave sought; (2) whether the requested leave generally complies with the employer's leave policies; and (3) the nature of the employee's prognosis, treatment, and likelihood of recovery." *Id.* at 561-562.[24] As to the first consideration, the Court noted that the record contained "many disputes" about how much leave King sought, but that by June 5, 2017, "she asked for a set amount of leave to cover her absences between April 28 and June 1." Then, applying the second consideration, the Court explained that "under th[ose] circumstances," "the record supports King's position that retroactively granting emergency leave can be a reasonable accommodation" and "[r]equests for retroactive leave are not per se unreasonable, and we have recognized employers' practices of granting retroactive leave in unforeseeable situations like this." *Id* at 562. Lastly, the Sixth Circuit held that one of the instances in which King made a "request for an accommodation" included when she began calling in sick on May 19, "telling the on-call supervisor (Bungard and others) that she was trying to get a leave but she hadn't gotten it yet so she was reporting off again for the next day." *Id.* at 565 (brackets removed).

The distinctions between Pennell's requests to retroactively use accrued PTO to avoid discipline on December 20, 2022, and March 29, 2023, and King's fourteen (14) requests for medical leave are substantial. First, and most importantly, the employer in *King* "had policies in place to handle these types of requests, including relaxed notice requirements for emergency leave requests and *a five-day look back period for retroactive requests*." *Id* at 563 (emphasis added). Pennell has

---

[24] TCC and Pennell only dispute retroactivity under consideration two, not the duration of the leave under considerations one and three. *See* 30 F.4th at 562-564.

not argued—and the record does not reflect—that TCC has any "look back period for retroactive requests" for PTO or the application of PTO to avoid discipline. [25]  And for the same reason, the employee's failure-to-accomodate claim in *Crispell* is distinguishable from Pennell's, because there, the employee's retroactive "request to be excused from the call-in rule when her symptoms prevented compliance simply represented a reasonable request to participate in [the employer]'s typical procedures."  2024 WL 3045224 at *10.

Second, and also key to the court's analysis, was that the hospital's own mistakes compounded to cause the delay in King's approval for leave, which *required* the accommodation she sought to apply retroactively.  *See id.* ("[The administrator's] own errors caused some of King's failure to give advance notice.  [The administrator] miscalculated her hours, and it violated its own policy by refusing to consider King's eligibility for both FMLA and non-FMLA leave when she first sought leave on May 19.  King cannot be faulted for the lengthy application process when the Hospital—through the agent it hired to process leave requests—caused the delays.").  In other words, King attempted to submit valid requests for an accommodation, but the employer's inadvertence prevented her from doing so.  Again, Pennell does not suggest that anything TCC did or refrained from doing contributed to his inability to timely request PTO.

---

[25] To be sure, Pennell *does* argue that "TCC's *FMLA* policy provided for unforeseeable leave." (Doc. No. 23 at PageID# 1123) (citing Doc. No. 19-2 at PageID# 788, Ramey Depo. at Tr. 46:7-48:1; Miller Depo. at Tr. 48:8-48:11).)  But Pennell was requesting to use his PTO time, not requesting FMLA leave.  *See King v. Lazer Spot, Inc.*, 2024 WL 3540400 at *9 (S.D. Ohio July 24, 2024) (""The leave provisions of the FMLA are wholly distinct from the reasonable accommodation obligations of employers covered under the ADA.") (quoting Comments to the Family and Medical Leave Act of 1993, 73 F.R. 67934-01, 2008 WL 4898395 at *68040 (Nov. 17, 2008) (quoting S. Rep. No. 103-3, at 38 (1993))) (cleaned up); *Greene v. U.S. Dep't of Veterans Affs.*, 605 Fed. Appx. 501, 503 (6th Cir. 2015) ("[the employee] requested advanced annual leave due to a popped blood vessel allegedly caused by stress and anxiety.  Advanced annual leave is distinct from leave under the FMLA, which [the employee] chose not to seek.").  TCC's policy distinguishes between PTO and FMLA requests as well, expressly providing for the "use of PTO while on FMLA[.]" (Doc. No. 17-2 at PageID# 425.)  And Page 29 of TCC's Handbook, which provides for unforeseeable FMLA leave, clearly pertains only to FMLA leave because it is under a heading called "Procedure for Requesting FMLA Leave."  (*Id.*)

Third, the hospital (through the administrator) ultimately *approved* King's request for leave as a retroactive accommodation, which the court held amounted to an admission that her request was a reasonable accmodation. *Id.* ("[T]he Hospital ultimately found that King qualified for non-FMLA leave between May 14 to June 1.  By granting King's leave request—even if only partially—the Hospital admitted that retroactive non-FMLA leave was a reasonable accommodation in this case."). Despite approval of retroactive leave, the hospital declined to undo its termination.  *Id.*  According to Pennell, Sikora did not grant Pennell's request and disciplined him, so unlike King, Pennell cannot attribute such an admission to TCC.  Thus, under those circumstances, none of which are present here, "[r]etroactively granting emergency leave" from May 19 onwards in *King* was a "reasonable accommodation[.]"  *Id.*

But when those circumstances are not present, as in this case, EEOC Guidance[26] and applicable Sixth Circuit precedent demonstrate that rescinding discipline is not a "reasonable accommodation" under the ADA because the "timing of the request is crucial."  *Yarberry*, 625 Fed. Appx. at 742.  Indeed, *Yarberry* is instructive.  There, the employee argued that "a leave of absence to seek treatment" was a reasonable accommodation, and the employer contended  that the employee "could not rely on his disability and request an accommodation *after* engaging in terminable misconduct."  *Id.* (emphasis added).  The Sixth Circuit agreed:

> Had Yarberry not already engaged in misconduct meriting termination, it is possible that his requests for time off due to his hospitalization might have been timely and Hhgregg would have been obliged to try to accommodate him. However, because Yarberry had already committed the misconduct that Hhgregg cited as the reason for

---

[26] *See Linden v. Comm'r of Soc. Sec.*, 131 F.4th 531, 534 (6th Cir. 2025) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 123, 139-40 (1944))) (explaining that an "agency's interpretation of statutes aren't controlling, but they are helpful" because "'[t]hey constitute a body of experience and informed judgment' that courts can use for guidance.").

47

> his termination, Hhgregg was not obligated to rescind Yarberry's termination or engage in further discussion of his requests for accommodation.

*Id.* And *Parsons v. Auto Club Grp.*, 565 Fed. Appx. 446 (6th Cir. 2014) is also instructive. The employee attributed his violation of the employer's internal expense policies to troubles associated with his sleep apnea. *Id.* at 448-49. During a discussion investigating his violations of the employer's policies, the employee allegedly said: "I've gotten [sic] something wrong, I've got sleep apnea. I'm falling asleep all the time" and explained that "he had fallen asleep at work and in his car driving home, and was 'scared to death of this[;]'" the court emphasized that his "statements came in the context of his defending against the allegations of misconduct and explaining why he was observed napping." *Id.* at 449. The court explained that "[e]ven if the discussion with [the employer] were a request, it likely came too late to be considered reasonable" because "'[w]hen an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be too little, too late.'" *Id.* (quoting *Jones v. Nationwide Life Ins. Co.,* 696 F.3d 78, 90 (1st Cir. 2012)) (cleaned up). Thus, the court held that the accommodation the employee requested was not reasonable. *Id.*

EEOC Guidance bolsters the prospectivity requirements set forth in *Yarberry* and *Parsons*. First, "a reasonable accommodation is always prospective" so "an employer is not required to excuse past misconduct even if it is the result of the individual's disability." EEOC Guidance on "Reasonable Accomodation and Undue Hardship Under the Americans With Disabilities Act" (hereinafter, "EEOC Guidance on Reasonable Accomodations"), 2002 WL 31994335 at *25 (Oct. 17, 2002).[27] Based on this guidance (absent the circumstances in *King* set forth above), rescinding

---

[27] The full guidance from this section provides: 36. Must an employer provide a reasonable accommodation for an employee with a disability who violated a conduct rule that is job-related for the position in question and consistent with business necessity? An employer must make reasonable accommodation to enable an otherwise qualified employee with

discipline is not a reasonable accommodation. *See, e.g.*, *Hrdlicka v. Gen. Motors LLC*, 2022 WL 989339 at *18 (E.D. Mich. Mar. 31, 2022), *aff'd*, 63 F.4th 555 (6th Cir. 2023) (quoting *Brookins v. Indianapolis Power and Light Co.*, 90 F. Supp. 2d 993, 1007 (S.D. Ind. 2000) and the *EEOC Guidance on Reasonable Accommodations*) ("[T]he EEOC recognizes '[s]ince reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability'"); *Lockhart v. Marietta City Sch.*, 2021 WL 4810172 at *11 (6th Cir. Oct. 15, 2021) (quoting the above EEOC Guidance and holding that "once Lockhart engaged in misconduct warranting termination, the District was allowed to proceed with disciplinary hearings and take the steps necessary to finalize her termination. It was not required to excuse her misconduct, keep her on staff, and consider what reasonable accommodations would allow her to fulfill the requirements of her role as a teacher moving forward."); *Messenheimer v. Coastal Pet Prods., Inc.*, 2018 WL 3609488 at *9 (N.D. Ohio July 27, 2018), *aff'd*, 764 Fed. Appx. 517 (6th Cir. 2019) (quoting the above EEOC Guidance and holding that "Messenheimer has provided no evidence that she asked for an accommodation *prior to* her demotion for either of her alleged limitations−vertigo and hearing loss−and she has thus failed to make out a *prima facie* case for failure to accommodate."); *Calandriello v. Tenn. Processing Ctr., LLC*, 2009 WL 5170193 at *6 (M.D. Tenn. Dec. 15, 2009) (quoting the above EEOC Guidance and holding that the the empoyer did not fail to provide a reasonable accommodation "because the accommodation [the employee] requested, i.e. that the Final Warning be removed from his employment record, is not one which [the

---

a disability to meet such a conduct standard in the future, barring undue hardship, except where the punishment for the violation is termination. Since reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability. Possible reasonable accommodations could include adjustments to starting times, specified breaks, and leave if these accommodations will enable an employee to comply with conduct rules." *EEOC Guidance on Reasonable Accomodations*, 2002 WL 31994335 at *25.

employer] was required to make.  Numerous courts have held that an employer may impose discipline for workplace violations on an individual with a disability and that a reasonable accommodation does not include foregoing or rescinding such discipline.").[28]

Second, "[a]lthough the ADA does not require employees to ask for an accommodation at a specific time, the timing of a request for reasonable accommodation is important because an employer *does not have to rescind discipline* (including termination) warranted by misconduct." EEOC Guidance on "Applying Performance and Conduct Standards to Employees with Disabilities" (hereinafter, "EEOC Guidance on Performance Standards"), 2008 WL 4786697 at *13 (Sept. 25, 2008) (emphasis added).  Based on this guidance as well, employers need not rescind discipline as a reasonable accommodation.  *See, e.g.*, *Shock v. Webster Indus., Inc.*, 2025 WL 3083072 at *4 (6th Cir. Sept. 16, 2025) (quoting *Yarberry* and the above EEOC Guidance  to hold that "[h]ad Shock not already engaged in terminable misconduct, his request for an ASL interpreter at the termination meeting would have been timely, and Webster might have been legally obligated to try to accommodate him.  But because Shock had already committed the misconduct that Webster cited as the reason for his termination and had not previously requested additional accommodations, the company was not required to rescind Shock's termination or engage in further discussion of his

---

[28] The  EEOC immediately follows up the above guidance requiring prospectivity with a notably apt illustration: "Example: An employee with major depression is often late for work because of medication side-effects that make him extremely groggy in the morning.  His scheduled hours are 9:00 a.m. to 5:30 p.m., but he arrives at 9:00, 9:30, 10:00, or even 10:30 on any given day.  His job responsibilities involve telephone contact with the company's traveling sales representatives, who depend on him to answer urgent marketing questions and expedite special orders.  The employer disciplines him for tardiness, stating that continued failure to arrive promptly during the next month will result in termination of his employment. The individual then explains that he was late because of a disability and needs to work on a later schedule.  In this situation, the employer may discipline the employee because he violated a conduct standard addressing tardiness that is job-related for the position in question and consistent with business necessity.  The employer, however, must consider reasonable accommodation, barring undue hardship, to enable this individual to meet this standard in the future.  For example, if this individual can serve the company's sales representatives by regularly working a schedule of 10:00 a.m. to 6:30 p.m., a reasonable accommodation would be to modify his schedule so that he is not required to report for work until 10:00 a.m." *EEOC Guidance on Reasonable Accommodations*, 2002 WL 31994335 at *25.

accommodation request."); *Gilbert v. City of Newport*, 2024 WL 5046712 at *8 (E.D. Tenn. Dec. 9, 2024) (quoting *Yarberry* and the above EEOC Guidance to hold that "[b]ecause defendant's legitimate basis for plaintiff's termination arose concurrently with his request for accommodation, defendant was not obligated to engage in the interactive process for [the] employee[.]"); *Glowe v. Mercy Health Youngstown, LLC*, 2022 WL 971385 at *6 (N.D. Ohio Mar. 31, 2022) (citing *Yarberry*, 625 Fed. Appx. at 740) ("An employer is not required to forgive its employee and rescind discipline after it learns the employee's misconduct was caused by an alleged disability.").

Third, employers may also "impose disciplinary action . . . for attendance problems that occurred prior to a request for reasonable accommodation."  EEOC Guidance on Performance Standards, 2008 WL 4786697 at *23; *Davis v. PHK Staffing LLC*, 2023 WL 8757073 at *5 (10th Cir. Dec. 19, 2023) (relying on the above EEOC Guidance to hold that "the October 2019 attendance incidents occurred before Davis made her accommodation request, so Hollywood Casino had no obligation to withdraw the points it gave her for those incidents.").

With the above principles and guidance serving as a backdrop, and for the reasons more fully explained below, the Court rejects Pennell's argument that his communications on December 19, 2022, March 29, 2023, and May 1, 2023 satisfy the ADA's requirements that Pennell request an accommodation, and that the accommodation be objectively reasonable in order to trigger TCC's duty to engage in the interactive process.

           **b)**       **Pennell did not request a reasonable accommodation in December 2022, March 2023, or May 2023.**

           **(1)**       **December 20, 2022 Corrective Action**

The December 20, 2022 Corrective Action discussion did not trigger TCC's duty to engage in the interactive process because although Pennell requested an accommodation from Sikora to use his PTO to avoid discipline, that request was not "reasonable."

After Pennell failed to submit his Store Visit Reports for November 17 - December 19, 2022, Sikora did not allow Pennell the opportunity to use his accrued PTO to avoid discipline (*see* Pennell Depo. at Tr. 50:8-51:6, 137:23-138:14) ("Q. What did you specifically ask for in December of 2022? A. I asked Tom if I could use my accrued time off for time that I had missed. . . . [Sikora] didn't respond."), but Sikora encouraged Pennell to take a break from work to address the effects of his depression and allowed him to do so. (*Id.*) Although Pennell attributed his failure to complete the Store Visit Reports to his diagnosis of depression, he failed to submit the Store Visit Reports *before* he made his request for an accommodation. But "[t]he timing of a request for reasonable accommodation is important because an employer does not have to rescind discipline (including termination) warranted by misconduct." *EEOC Guidance on Performance Standards*, 2008 WL 4786697 at *13. "[T]he employer may discipline the employee because he violated a conduct standard addressing tardiness that is job-related for the position in question and consistent with business necessity." *EEOC Guidance on Reasonable Accommdations*, 2002 WL 31994335 at *25. That guidance confirms, as TCC points out, that "[s]ince reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability." *Id.*

Here, Pennell admits that he only requested accommodations to retroactively rescind his discipline, not to prospectively seek an accommodation from TCC.  Therefore, Pennell's December 2022 request was not one for a "reasonable accommodation" so it did not trigger TCC's duty to engage in the interactive process.  *See id.*; *Parsons*, 565 Fed. Appx. at 449.

### (2)  March 30, 2023 Final Written Warning Discussion

Pennell also asserts that he made the same request to use his PTO to rescind his discipline before being issued the Final Written Warning for missing parts of the May 2023 Convention. (Pennell Depo. at Tr. 127:13-127:16) ("Q. What you were asking for was retroactively, if you could apply a couple of PTO days to the time you missed at the conference?  A. That's right.").  That too was not a request for a prospective accommodation, but only one to retractively rescind his discipline.  Therefore, for the same reason his request in December 2022 did not ask for a "reasonable accommodation,"  this request also did not, so it too failed to trigger TCC's duty to engage in the interactive process.

### (3)  Pennell's May 1, 2023 Texts and Email

Finally, the texts and email Pennell sent to Sikora on May 1, 2023 after he failed to attend the May 1, 2023 team meeting were not requests for an accommodation.  As noted in Section I.F. above, Pennell repeatedly texted Sikora from 2:03 to 2:17 PM that he "stayed late working on my last few visits from April and slept through my alarms!"  (Doc. No. 17-3 at PageID# 473.)  Then, he sent his 4:18 PM Email, where he wrote that he "[w]anted to let you know about the appointment I made to address some of the mental health challenges I've experienced, specifically over the past year or so.  June 13th is the earliest I could get in, and was scheduled back in February.  I'm looking forward to discussing my symptoms with the doc and ultimately feeling better.  This is where I'm

53

going - https://www.acmchealth.org/provider-directory/providers/samar-el-savegh-md/ Thanks[.]"
(Doc. No. 17-2 at PageID# 469.)

The law is clear that the employee must "request a reasonable accommodation" to trigger the employer's duty to engage in the interactive process. *See Hrdlicka*, 63 F.4th at 572 (quoting *Rorrer*, 743 F.3d at 1041). The above communications do not even "request" an accommodation, let alone a "reasonable accommodation." Pennell's texts inform Sikora that the reason he was late for their meeting was that he slept through his alarms, which he attributes to his working late the evening before. Pennell's email informs Sikora that he has made an appointment with a health provider to address his mental health issues, but Pennell does not "request" that TCC do or refrain from doing anything. Therefore, Pennell did not request an accommodation. The flexibility *King*'s standard allows for employees in "*how* they request an accommodation" does not absolve the employee of the basic requirement of making some form of a request, but neither Pennell's texts nor his email requests anything at all from Sikora. *See* 30 F.4th at 564 (emphasis added)

Therefore, these communications also did not "request" a reasonable accommodation, so these communications did not trigger TCC's duty to engage in the interactive process.

Accordingly, for the reasons set forth above, Pennell has failed to raise a genuine issue of material fact that he made a "request for a reasonable accommodation[,]" so he never triggered TCC's duty to engage in the interactive process. Therefore, TCC is entitled to judgment on Counts III and IV.

### C.    FMLA Interference Claim (Count V)

Pennell asserts a claim for FMLA interference (Count V) under 29 U.S.C. § 2611 *et seq*. (Count V). To state a claim for FMLA interference, a plaintiff must allege that "(1) he was an

54

eligible employee, (2) the defendant was a covered employer, (3) he was entitled to take leave, (4) he gave the defendant notice of his intent to take leave, and (5) the defendant denied his FMLA benefits or interfered with his FMLA rights." *Bobnar v. AstraZeneca Pharms. LP*, 758 F. Supp. 3d 690, 738 (N.D. Ohio 2024 (Barker, J.) (quoting *Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 631 (6th Cir. 2018) and citing *Hrdlicka*, 63 F.4th at 572). The parties dispute only the fourth element, i.e., whether Pennell gave TCC sufficient notice of his intent to take FMLA leave. (Doc. No. 23 at PageID#s 1125-26.)

In its Motion, TCC argues that Pennell never requested FMLA leave or discussed it with TCC even though he had access to TCC's FMLA leave policy. (Doc. No. 16 at PageID#s 111-12.)

In his Opposition, Pennell responds that the FMLA regulations do not require the employee to mention the FMLA when giving notice of intent to take FMLA leave, and that "when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave[.]" (Doc. No. 23 at PageID# 1126) (citing 29 C.F.R. §§ 825.300(b)(1), 825.303(b)). According to Pennell, TCC violated Pennell's FMLA rights because "no one advised Josh of his rights under the FMLA." (*Id.*) Had the FMLA leave been applied retroactively to cover his absences in March 2023 and on May 1, 2023, he asserts, it would have constituted FMLA interference for TCC to terminate him for his absences. (*Id.* at PageID#s 1126-27.)

In its Reply, TCC points out that Pennell knew of TCC's FMLA policy but did not avail himself of its provisions. (Doc. No. 24 at PageID#s 1143-44.) TCC cites *Hrdlicka* to establish that Pennell only made vague statements akin to "feeling depressed" or having a "mental thing[,]" and

Pennell never submitted medical documentation to support his absences.  (*Id.*) (quoting 63 F.4th 555, 567-68).

For the reasons below, the Court finds that there is no genuine issue of material fact that Pennell failed to provide the requisite notice mandated by 29 C.F.R. § 825.303 and TCC's FMLA policy requiring advanced notice because he did not provide advanced notice, and there were no "unusual circumstances" within the meaning of 29 C.F.R. § 825.303(c) excusing his failure to do so.

"'When an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA.'"  *Render v. FCA US, LLC*, 53 F.4th 905, 926 (6th Cir. 2022) (Moore, J., controlling concurrence) (quoting 29 C.F.R. § 825.303(b)).[29]  "The critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job."  *Hrdlicka*, 63 F.4th at 573 (quoting *Koch v. Thames Healthcare Grp., LLC*, 855 Fed. Appx. 254, 256 (6th Cir. 2021) and *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004)).  "Once the employer has acquired knowledge that the leave is being taken for a FMLA-qualifying reason, the employer must notify the employee as provided in § 825.300(d)."  *Barrett v. Detroit Heading, LLC*, 311 Fed. Appx. 779, 791 (6th Cir. 2009) (quoting 29 C.F.R. § 825.301(a)).  That is because "FMLA regulations 'make it the employers responsibility to tell the employee that an absence will be considered FMLA leave.'"  *Anderson v. Detroit Trans. Corp.*, 435

---

[29] Judge Moore and Judge Suhreinrich "wr[ote] separately to explain our majority position on Render's interference claim. . .  this opinion . . . sets forth the majority position with respect to Render's interference claim."  *Render*, 53 F.4th at 923.

F. Supp. 3d 783, 790 (E.D. Mich. 2020) (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 87 (2002)).

The Sixth Circuit has explained that there are two different notice requirements for FMLA leave "depending on whether the need for leave is foreseeable or unforeseeable." *Render*, 53 F.4th at 924 (quoting 29 C.F.R. § 825.301(b)). Foreseeable leave is governed by 29 C.F.R. § 825.302, while unforeseeable leave is governed by 29 C.F.R. § 825.303. For instance, the court in *Render* clarified that an employee who was diagnosed with depression was required to comply with the regulation for unforeseeable leave:

> Employees with known health conditions that result in 'a sudden, acute flareup' of symptoms must follow 29 C.F.R. § 825.303, not 29 C.F.R. § 825.302, when requesting leave. Render was one such employee. Like the employee with chronic migraines, Render's mental-health issues meant that he was likely to miss at least several days of work a month. R. 22-14 (Med. Certification at 2) (Page ID #190). When these absences would occur, however, was unpredictable. That makes the leave unforeseeable and makes § 825.303 the applicable notice regulation.

53 F.4th at 926 (citing *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1276 (11th Cir. 2020)). The full text of § 825.303(c) reads as follows:

> Complying with employer policy. When the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. For example, an employer may require employees to call a designated number or a specific individual to request leave. However, if an employee requires emergency medical treatment, he or she would not be required to follow the call-in procedure until his or her condition is stabilized and he or she has access to, and is able to use, a phone. Similarly, in the case of an emergency requiring leave because of a FMLA–qualifying reason, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved. If an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA–protected leave may be delayed or denied.

29 C.F.R. § 825.303(c).  In other words, "[u]nder [§ 825.303(c)], even if leave is unforeseeable, 'an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, *absent unusual circumstances*.'"  *Crispell*, 2024 WL 3045224 at *6 (quoting 29 C.F.R. § 825.303(c)) (emphasis added); *Moore v. Bristol Metals, LLC*, 2015 WL 914654 at *7 (E.D. Tenn. Mar. 3, 2015) (citing 29 C.F.R. § 825.303(c)) ("[t]he FMLA does not excuse employees from complying with an employer's reasonable notice requirements.  However, federal regulations partially excuse this requirement where leave is unforeseeable and there are *unusual circumstances* such as an emergency.")  Indeed, TCC's handbook mirrors § 825.303(c): "When the need for FMLA leave is not foreseeable, the Employee must comply with the Company's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances."  (Doc. No. 17-2 at PageID# 425.)  Such "[u]nusual circumstances include 'emergenc[ies] requiring leave because of a FMLA-qualifying reason.'"  *Crispell*, 2024 3045224 at *6 (quoting 29 C.F.R. § 825.303(c)).

TCC does not dispute that Pennell's depression is his FMLA-qualifying reason, only whether he provided proper notice.  Therefore, based on TCC's Handbook and § 825.303(c), Pennell was required to comply with TCC's "usual and customary notice and procedural requirements" *unless* his depression (i.e., his FMLA-qualifying reason) caused an "unusual circumstance" which would have excused such notice.  29 C.F.R. § 825.303(c).

Here, TCC's Handbook contains a section titled "Time Away From Work[.]"  (Doc. No. 17-2 at PageID# 421.)  That section contains a bolded sub-section titled "FAMILY AND MEDICAL LEAVE ACT (FMLA)[.]"  (*Id.* at PageID# 424.) That sub-section, in turn, contains a paragraph titled "Procedure for Requesting FMLA Leave" that begins with the following sentence: "All Employees requesting FMLA must provide verbal or written notice to the Human Resources

Department."  (*Id.* at PageID# 425.)  It is undisputed that Pennell read the FMLA section of TCC's

Handbook (Pennell Depo. at Tr. 47:20-47:22) ("Q.  Did you ever read the policy when you were at

TCC?  A. Yes."), but never contacted HR about his disability, health condition, or medical condition:

> Q.  Did you ever make any request for Family Medical Leave Act at any time while you were
> at TCC?
>
> A.   Not specifically, no.
>
> Q.  Did you ever have a discussion with anybody at TCC about the Family Medical Leave
> Act, or FMLA leave?
>
> A.  No.
>
> ***
>
> Q.  Did  you  ever  contact  anyone  in  human   resources  at  TCC  to  request  an
> accommodation for a  disability or a medical condition?
>
> A.  Not human resources, but Tom I did, yeah.
>
> Q. Okay. Other than Tom, did you contact anyone else at TCC about any health
> condition or disability?
>
> A.  No.

(*Id.* at Tr. 47:23-49:9.)  Because Pennell did not comply with the "usual and customary notice and

procedural requirements" under § 825.303(c), the viability of Pennell's claim necessarily depends

on whether his depression caused an "unusual circumstance" because if so, as noted above, that

would have excused his compliance with the TCC's and § 825.303(c)'s notice requirement.  *See* 29

C.F.R. § 825.303(c).  And that, in turn, depends on whether TCC has shown that there is no dispute

that this was a "case of an emergency requiring leave because of" Pennell's depression.  *Id.*

Pennell cites *Crispell* but that case is unpublished and easily distinguishable. "Crispell suffered from major depression, mood swings, and anxiety, which qualified her to take leave through [FMLA]." 2024 WL 3045224 at *1. She worked at FCA until 2018, and "[b]eginning in 2012, in support of [her] FMLA leave requests, Crispell's psychiatrist Dr. Leon Rubenfaer submitted annual reports to CFA explaining Crispell's condition." *Id.* (citation omitted). In those reports, Dr. Rubenfaer explained that "Crispell's symptoms would incapacitate her on an intermittent basis." *Id.* FCA issued progressive discipline to (and ultimately terminated) Crispell for failing to provide advanced notice that she would be absent from work. *See* 2024 WL 3045224 at *5-7. The court first noted that "the adequacy of an employee's FMLA notice generally is an intensely factual determination." *Id.* at *6 (quoting *Render*, 53 F.4th at 926) (citation omitted) (cleaned up). Crispell "submitted letters after each late call-in that specifically cited her 'covered illness' as the reason that she should not be penalized." *Id.* "The letters Crispell submitted after each tardy also complied with her initial burden" under § 825.303(b), the court reasoned, because they "specifically reference either the qualifying reason or the need for FMLA leave." *Id.* at *7 (quoting 29 C.F.R. § 825.303(b)). The court held that those post-absence letters created a genuine dispute of material fact "about whether Crispell's failure to call in advance of her tardies was due to unusual circumstances within the meaning of 29 C.F.R. § 825.303(c)" and reversed the district court's grant of summary judgment. *Id.*

Here, however, Pennell has not submitted even one (1), let alone six (6) physician reports that he would become intermittently incapacitated. The court expressly relied on FCA's "ample familiarity" with Crispell's disability in determining that her depression created an "unusual circumstance" justifying her failure to provide notice. *Id.* at *7. Pennell, in fact, distinguished

60

himself from Crispell—he certified that he *had* the ability to and *would* provide advanced notice ahead of absences when he signed the March 29, 2023 Corrective Action: "Going forward I will take care in attending all business functions or communicate ahead of time if I'm not able."  (Pennell Depo. at Tr. 141:16-141:17.)  That stands in stark contrast to Crispell, who had a physician certify that she could *not* always communicate ahead of time due to her disability.

The example provided in the text of § 825.303(c) bolsters the conclusion that Pennell has shown no "unusual circumstance" justifying his failure to provide advanced notice.  It refers to an employee who "requires emergency medical treatment, [who] would not be required to follow the call-in procedure until his or her condition is stabilized and he or she has access to, and is able to use, a phone." 29 C.F.R. § 825.303(c).  Black's Law Dictionary defines an emergency as "[a] sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm" or "[a]n urgent need for relief or help; an exigent circumstance in which immediate assistance is needed to protect property, public health, or safety, or to lessen or avert the threat of a disaster."  *Emergency*, Black's Law Dictionary (12th ed. 2024).  Pennell never suggests that he required "emergency medical treatment" or that his condition was so destabilizing that he could not use his cell phone.  On the contrary, after he missed the event at The Painted Duck on Monday, March 28, 2023, Sikora texted him at 10:45 PM asking him if he attended.  (Doc. No. 17-3 at PageID# 543.)  Pennell texted back the next morning at 7:05 AM that he was "exhausted by then and needed to lay down" and, when Sikora asked him where he was during the conference he texted back that he was "[g]etting dressed." (*Id.*)  His failure to point to any depression-related need for emergency medical treatment or depression-related inability to use his cell phone places him far

outside the "unusual circumstances" necessary to justify his failure to provide advanced notice to TCC.  *See* 29 C.F.R. § 824.303(c).

Other district courts interpreting "unusual circumstances" for medical conditions have only found such "unusual circumstances" where the plaintiff's excuse showed an exigency that effectively incapacitated him or her.  *See, e.g.*, *Ortega v. San Juan Coal Co.*, 2013 12116377 at *17 (D.N.M. Oct. 3, 2013) (finding a genuine issue of material fact where plaintiff testified that he developed a four-day (4) "severe debilitating migraine" that made him "unaware of his surroundings" and "unable to use [his] phone" two (2) days after his physicians "altered his medications," and the medications included severe migraines as a possible side-effect); *Medley v. Cnty. of Montgomery*, 2013 WL 300741 at *6 (E.D. Pa. Jan. 25, 2013) (finding a genuine issue of material fact where plaintiff failed to provide advanced notice because she was taking care of her son with Asberger's who, 1-2 time per week and for up to 3 hours each time, would  "experience[e] panic attacks inclusive of crying, hiding in [a] closet, covering [his] ears to block out stimuli, verbalizing [his] concern his mother will die, [and] clinging to" his mother, and he "began having anxiety attacks in which he would lock himself in a closet, hit and scratch himself, refuse to talk, and attempt to hurt himself.").

Pennell's May 1, 2023 texts to Sikora did not reference a depression-related "emergency" similar to those incidents, but instead he attributed his failure to provide advanced notice or make their 10:00 AM scheduled meeting to his having stayed up late working the night before.  (Doc. No. 17-3 at PageID# 473) (Pennell texting Sikora, "I stayed up late working on my last few visits from April and slept through my alarms!").  The Court finds that Pennell's procrastination in waiting to

62

submit his store visits reports until the evening of April 30, 2023, does not constitute such an "unusual circumstance" akin to an "emergency" within the meaning of 29 C.F.R. § 825.303(c).

Having failed to show such "unusual circumstances" on March 27 and 28, 2023, or on May 1, 2023, Pennell was required to follow the "usual and customary notice and procedural requirements" to properly give notice of his intent to take FMLA benefits under § 825.303(c) and TCC's Handbook, but he did not do that.  (*Compare* Pennell Depo. at Tr. at 49:6-49:9 ["Q. Okay. Other than Tom, did you contact anyone else at TCC about any health condition or disability? A. No."] *with* Doc. No. 17-2 at PageID# 425 ["All Employees requesting FMLA must provide verbal or written notice to the Human Resources Department."].)

Therefore, TCC did not interfere with Pennell's right to leave under the FMLA even though it did not notify Pennell of his right to take FMLA leave under 29 C.F.R. § 825.300(b)(1) because TCC did not "acquire[] knowledge that [Pennell's] leave may be for an FMLA-qualifying reason."). 29 C.F.R. § 825.300(b)(1).

Accordingly, for the reasons set forth above, TCC is entitled to judgment on Count V.

## V.    Conclusion

For the reasons set forth above, TCC's Motion (Doc. No. 16) is GRANTED.

**IT IS SO ORDERED.**

      *s/Pamela A. Barker*
      PAMELA A. BARKER
Date:  December 9, 2025      U. S. DISTRICT JUDGE